772 F.2d 1043
 23 ERC 1153, 15 Envtl. L. Rep. 20,998
 SIERRA CLUB, Hudson River Fishermen's Association, NYC Clean
Air Campaign, Inc., the Hudson River Sloop Clearwater, Inc.,
the City Club of New York, Business for Mass Transit,
Committee for Better Transit, Inc., West 12th Street Block
Association, Friends of the Earth, Otis Burger, Mary Rowe,
and Howard Singer, Plaintiffs-Appellees,
v.
UNITED STATES ARMY CORPS OF ENGINEERS, John Marsh, as
Secretary of the Army of the United States, E.R. Heiberg,
III, as Chief of Engineers, Fletcher H. Griffis, as New York
District Engineer, United States Department of
Transportation, Elizabeth Dole, as Secretary of
Transportation of the United States, Federal Highway
Administration, Raymond A. Barnhart, as Federal Highway
Administrator, United States Environmental Protection
Agency, Lee Thomas, as Administrator of the Environmental
Protection Agency, Christopher J. Daggett, as Administrator,
Region II of the Environmental Protection Agency, James L.
Larocca, as Commissioner of the New York State Department of
Transportation, Defendants,
United States Army Corp of Engineers, Federal Highway
Administration and the New York State Department
of Transportation, Defendants-Appellants.
 Nos. 304, 315, Dockets 85-6297, 85-6299.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 29, 1985.
Decided Sept. 11, 1985.
 
 Howard Wilson, Asst. U.S. Atty. for the S.D. of N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Marc H. Rosenbaum, Randy M. Mastro, Asst. U.S. Attys. for the S.D. of N.Y., New York City, of counsel), for defendants-appellants U.S. Army Corps of Engineers and Federal Highway Admin.
 Paul J. Curran, New York City (Bruce Margolius, Kimberly A. McFadden, Lauri A. Novick, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellant N.Y. State Dept. of Transp.
 Mitchell S. Bernard, New York City (Jean M. McCarroll, Butzel & Kass, New York City, of counsel), for plaintiffs-appellees.
 Before MANSFIELD, CARDAMONE and PRATT, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 A change in something from yesterday to today creates doubt. When the anticipated explanation is not given, doubt turns to disbelief. This case is capsulized in that solitary simile. Following review during a 30-day trial of a remanded administrative proceeding, the United States District Court for the Southern District of New York (Griesa, J.) entered a judgment in favor of plaintiffs, Sierra Club and others on August 8, 1985. That judgment declared null and void a landfill permit for the West Side Highway Project (Westway) issued by the U.S. Army Corps of Engineers (Corps) on February 25, 1985 and funding approvals for Westway granted by the Federal Highway Administration (FHWA) on March 18, 1985. The judgment also permanently enjoined defendant New York State Department of Transportation (State) from construction of Westway.
 
 
 2
 In its 132-page opinion the district court found that the Corps' decisionmaking process had violated the National Environmental Policy Act (NEPA), the Clean Water Act and court orders previously issued in 1982. From this judgment the Corps, FHWA and the State appeal and an expedited hearing was held before us on August 29, 1985. We affirm the district court's conclusion with respect to the inadequacy of the federal defendants' Final Supplemental Environment Impact Statement (FSEIS), but reverse the grant by the district court of a permanent injunction and remand the matter to the federal defendants.
 
 
 3
 To put this case in proper perspective, we outline briefly its chronology, prior legal proceedings, actions taken on remand and the opinion below.
 
 I BACKGROUND
 
 4
 A. Early Chronology and Prior Legal Proceedings
 
 
 5
 The highway portion of Westway presently proposed contemplates a mostly underground six lane highway extending from the Battery to 42nd Street bordering the Hudson River on the west side of Manhattan. Approval of Westway as a link in the interstate highway system made New York State eligible for 90 percent federal funding for the project. The redevelopment project envisions a 93 acre park, planted on a roof covering the highway, together with extensive residential and commercial development. The total cost of the project is estimated to be 2 billion dollars and requires that 242 acres of the Hudson be landfilled to complete it.
 
 
 6
 The selection of the Westway project resulted from a process of lengthy study and consultation that began in late 1971 when the City and State of New York requested approval of the West Side highway corridor as part of the Interstate System. That process included discussion with a broad range of State and City agencies and community groups, not only concerning alternatives to the dilapidated West Side Highway, but also about methods of coordinating the highway reconstruction with redevelopment in the deteriorating pier and shoreline areas on the west side of Manhattan.
 
 
 7
 In April 1974 a draft environmental impact statement (EIS) was circulated for public review. Extensive public hearings were held during the following six-month period for comment, and five alternatives were identified. In January 1977 a Final EIS (FEIS) was approved that selected Westway as the preferred alternative. Later in 1977 the State filed an application with the Corps for a dredge-and-fill permit that was issued on March 13, 1981.
 
 
 8
 Litigation brought to challenge the permit's issuance has been before us previously. Sierra Club v. United States Army Corps of Engineers, 701 F.2d 1011 (2d Cir.1983); Sierra Club v. Hennessy, 695 F.2d 643 (2d Cir.1982). In these two decisions we upheld essentially the district court's conclusion that the 1977 FEIS--which described the Westway area as a "biological wasteland" (suggesting no fish lived there)--had failed to reveal to the public the possible importance of the site as a winter habitat for juvenile striped bass. Action for Rational Transit v. West Side Highway Project, 536 F.Supp. 1225, 1229 (S.D.N.Y.1982). At that time many experts believed the juvenile striped bass used the Westway landfill area as an "overwintering" habitat--a place where these young fish remained more or less constantly throughout the winter months. 701 F.2d at 1024; 536 F.Supp. at 1246-1247.
 
 
 9
 Thus, in orders dated April 14 and July 23, 1982 the district court enjoined most construction and many other activities related to Westway and set aside the 1981 landfill permit granted by the Corps and the funding approvals granted by FHWA. The district court in its April order included a provision requiring the Corps to "keep records of all activities, deliberations, and communications (including communications with the FHWA and any other federal official or agency) which occur in relation to [the Westway] permit application." On appeal, we affirmed "the unusual but appropriate" record keeping order and directed the federal defendants "to make their own independent evaluations" of the fisheries issue. Sierra Club v. United States Army Corps of Engineers, 701 F.2d at 1048.
 
 B. Remand
 
 10
 On April 22, 1982 the State again applied to the Corps for a landfill permit for Westway. In October 1982 the Corps convened a workshop of experts to discuss whether and what type of further study was necessary to resolve the question of the fishery habitat. This workshop recommended that a 17 month analysis be undertaken and that the program include various habitat studies. In July 1983 a second workshop of experts was called to assess the need for additional fisheries studies. Participants at that workshop were in agreement that determining the severity of Westway's effect on the striped bass was a matter beyond the state of the art.
 
 
 11
 Despite this uncertainty, on September 13, 1983 a decision was made by the Corps' New York District Engineer to conduct two winters of additional study to determine Westway's impact on the Hudson River bass. The Governor of New York appealed this decision to the Secretary of the Army, who directed the Corps' Chief of Engineers to determine whether a two-winter project was necessary. A resulting task force report caused the Secretary to decide on December 15, 1983 that although a Supplemental Environmental Impact Statement for Westway could be prepared with existing information under the worst-case regulations, the Corps' New York District Engineer should proceed with a study, limited to one winter--or four months--rather than the 17 months the workshop had recommended.
 
 
 12
 On May 28, 1984 the Corps and FHWA published a Draft Supplemental Environmental Impact Statement (DSEIS or draft report). The DSEIS concluded that the proposed Westway project landfill would cause a significant loss of habitat to Hudson River juvenile striped bass. It stated that such loss would be a "significant adverse impact to the Hudson River Stock of this species." Though not critical, the SEIS continued, Westway would likely cause "long-term repercussions" resulting in "depressed population levels for the foreseeable future." That harm could be amplified by other projects, e.g., Battery Park City and New Jersey's Harbor Drift, and "the danger to the stock and its ability to recover from the Westway loss could ultimately hinge on what direction these other proposals take." Finally, the draft report stated it would be "imprudent to consider any such habitat loss as projected by the Westway landfill to be either minimal, insignificant, or sustainable at current population levels."
 
 
 13
 On June 26 and 27, 1984 the federal defendants held a public hearing on the DSEIS, at which testimony was received from hundreds of persons, including representatives of the plaintiffs and federal, state and city officials. During the following 45-day comment period, the Corps and FHWA received numerous additional comments from concerned parties. Significantly, from the May 1984 publication of the DSEIS to the November 1984 publication of the FSEIS no new data was collected.
 
 
 14
 In late November 1984 after having reviewed all of the comments received on the DSEIS and having completed its analysis, the Corps issued a Final Supplemental Environmental Impact Statement (FSEIS or final report). In that final report the Corps concluded that the perceptible long-term decline in stock would be difficult to discern from normal yearly fluctuations and would have only "minor impacts" on the fishery. Even in a worst case scenario, the Corps continued, the consequence of the landfill would still be "insufficient to significantly impact" the commercial fishery and "though persistent, the magnitude of the depressed population is likely to be relatively small ... and not a critical (or even minor) threat to its well being, nor to that of the commercial/recreational fishery."
 
 
 15
 After publishing the FSEIS, the Corps solicited and received further comments that it considered before making a final permit decision. On January 24, 1985 the Corps Engineer for New York issued his Record of Decision in which he announced his intention to grant a permit for Westway's construction. On February 25 the Corps issued a new landfill permit for Westway and on March 18 the FHWA published its Record of Decision and also reissued its funding approvals.
 
 C. Opinion Below
 
 16
 On April 18, 1985 plaintiffs filed a Supplemental Complaint in this action alleging that the landfill permit issued for Westway's construction was invalid. The U.S. Environmental Protection Agency (EPA) was added as a defendant.
 
 
 17
 Judge Griesa held a seven-week trial from May 20 to July 12, 1985 to review the agencies' decisions. At trial, the federal officials involved in issuing the permit and their key advisors were questioned on virtually every aspect of the decisionmaking process, including the substance of internal deliberations and their thought processes. The district court also heard testimony from several witnesses offered as experts, some of whom supported the Corps' fisheries analysis and others, presented by plaintiffs, who criticized it.
 
 
 18
 On August 7, 1985 Judge Griesa issued his opinion in which he ruled in plaintiffs' favor on all claims raised by them against the Corps and FHWA. According to the district court's summary of its findings, defendants had failed adequately to disclose the nature and purpose of Westway and had failed adequately to support their conclusion that the impact on the striped bass fishery would be minor. The district court held that the Corps' finding that the landfill would have a minor impact on the striped bass was arbitrary because the Corps had: (a) no reasoned basis for the reversal of its analysis of impacts from the DSEIS to FSEIS; (b) improperly relied on the government's expert; (c) failed to collect sufficient data to support its analysis; and (d) failed adequately to consult and give full consideration to the views of federal fishery agencies.
 
 
 19
 As noted at the beginning, the central issue on which this case hinges is the Corps' denial of the change that clearly emerged from its draft report to its final report. The district court concluded that the denial was illogical and that it failed as an explanation. Although we agree with the district court's ultimate conclusion, we must consider the arguments raised by the federal defendants and the State. They claim that the district court improperly conducted a de novo review on the merits and improperly substituted its judgment for that of the Corps on the complex fisheries issues. Additionally, defendants assert that the trial court erred in requiring the Corps to adopt the views of federal fishery resource agencies, and in finding that the federal defendants had not disclosed information relating to practicable alternatives. These claims have merit. There were errors in the district court's approach to its review of the administrative record that require discussion.
 
 II STATUTES INVOLVED
 
 20
 Before analyzing these matters, we examine the controlling law. This litigation involves two federal statutes: NEPA and the Clean Water Act. The implementation of the legislative objectives expressed in these Acts is entrusted to the executive branch--in this case the federal defendants. We examine first the objectives of these legislative enactments and the scope and limitations of agency power to administer them.
 
 A. NEPA
 
 21
 NEPA is designed to "encourage productive and enjoyable harmony between man and his environment ... [and to] prevent or eliminate damage to the environment...." 83 Stat. 852, 42 U.S.C. Sec. 4321. Section 102(2)(C) of NEPA sets forth procedures to insure the achievement of these substantive purposes. It provides:
 
 
 22
 The Congress authorizes and directs that, to the fullest extent possible ... (2) all agencies of the Federal Government shall--
 
 
 23
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 
 
 24
 (i) the environmental impact of the proposed action,
 
 
 25
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 26
 (iii) alternatives to the proposed action,
 
 
 27
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 28
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 29
 Congress' aim under Sec. 102(2)(C) is to force federal agencies to consider environmental concerns early in the decisionmaking process so as to prevent any unnecessary despoiling of the environment. The "detailed statement by the responsible official" is procedurally required because its presence evidences the fact that environmental consequences were factored into the planning stage of agency deliberation. Andrus v. Sierra Club, 442 U.S. 347, 350-51, 99 S.Ct. 2335, 2337-38, 60 L.Ed.2d 943 (1979). The object is for an agency to reach a decision only upon which it is fully informed and only after the decision has been well-considered. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The "detailed statement" thus helps a reviewing court to decide whether an agency has met that objective. It serves further as an environmental full disclosure law so that the public can weigh a project's benefits against its environmental costs. To that end it must be written in clear, understandable language. Perhaps most important, the detailed statement insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug. Silva v. Lynn, 482 F.2d 1282, 1284-85 (1st Cir.1973).
 
 
 30
 The Council on Environmental Quality (CEQ) has adopted regulations implementing NEPA contained in 40 C.F.R. Parts 1500-1508. The Corps has promulgated regulations set forth in 33 C.F.R. Part 230 that are designed to supplement the CEQ final regulations. Under Sec. 230.11 of the Corps' regulations a draft EIS is required. A draft EIS must "fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(c) of the Act." 40 C.F.R. Sec. 1502.9(a).
 
 B. Clean Water Act
 
 31
 Policy goals similar to those contained in NEPA are expressed in the Clean Water Act of 1977, particularly for the protection and propagation of fish. 33 U.S.C. Sec. 1251(a)(2). This Act grants authority to the Secretary of the Army, after notice and opportunity for public hearings, to issue a permit for dredged or fill material to be discharged into navigable waters. 33 U.S.C. Sec. 1344(a).
 
 
 32
 Regulation of the discharge of dredged or fill material has been entrusted to the Corps and to the EPA. The Corps has the responsibility for issuing or denying permits for such discharge. See 33 U.S.C. Sec. 1344(a). The EPA develops guidelines governing the issuance of a permit, see Id. Sec. 1344(b)(1). The EPA promulgated the 404(b)(1) Guidelines that are set forth in 40 C.F.R. Part 230. Under these regulations, if a proposed landfilling does not comply with the Guidelines, the Corps must deny a permit. 49 Fed.Reg. 39479 (Oct. 5, 1984) (adding section 323.6(a) to 33 C.F.R. Part 323). The Guidelines further prohibit landfilling "unless it can be demonstrated" that the activity will not have an "unacceptable adverse impact" on the aquatic ecosystem. See 40 C.F.R. Sec. 230.1(c). Under the regulations, "unacceptable adverse effect" is defined as an "impact on an aquatic or wetland ecosystem which is likely to result in ... significant loss of or damage to fisheries...." Id. Sec. 231.2(e). Thus, to comply with the Guidelines, an applicant must demonstrate that the proposed project will not likely result in significant loss of or damage to fisheries.
 
 III SCOPE OF REVIEW
 
 33
 Since judicial review is not specifically provided for under either NEPA or the Clean Water Act, review is under the Administrative Procedure Act, 5 U.S.C. Sec. 706. Under that law challenged agency action must be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Secs. 706(2)(A).
 
 A. Review Under NEPA
 
 34
 When reviewing an administrative decision made under NEPA, the purpose is to ensure that the agency has considered the environmental consequences of its proposed action. Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980). To conform with NEPA, a reviewing court need only find that the agency considered the environmental consequences of its proposed actions. An agency making a decision under this statute does not have to accord environmental concerns any more weight in the decisionmaking process than other appropriate concerns. If an agency decides that the economic or social benefits of a project outweigh its environmental costs, its choice must be affirmed so long as the procedural requirements of NEPA were followed, that is, environmental consequences were considered. Id. at 227, 100 S.Ct. at 499.
 
 
 35
 In weighing whether an agency has met NEPA's expressed objectives the test is not whether the district court, this Court or even the Supreme Court would have reached the decision under review had we been decisionmakers within the agency. Rather, the judicial role is relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached. Bowman Transportation Inc. v. Arkansas-Best Freight Systems, Inc., 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974). Consistent with our concept of federalism, a reviewing court's scope is so limited because it may not "interject itself within the area of the executive as to the choice of the action to be taken." Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).
 
 B. Review Under the Clean Water Act
 
 36
 The purpose of judicial review under the Clean Water Act differs slightly because of its enabling statute. Like NEPA, the Clean Water Act requires that an environmental concern--here the impact on the aquatic environment--be considered at an early enough stage in the policymaking process to affect the agency decision. But the Clean Water Act provides for a more intrusive power of review, one whose purpose is to prohibit agency action whenever certain environmental impact thresholds are met. Instead of simply insisting procedurally that the agency weigh environmental concerns, the Clean Water Act specifically prohibits an agency from sanctioning a project that it finds will have a significant adverse impact on the marine environment. Therefore, when an agency approves a project that the record before a reviewing court reveals will have a significant adverse impact on marine wildlife, the agency determination must be reversed.
 
 C. Review in General
 
 37
 In the past, as Dean Landis noted, there may have been a sense of contest between courts and administrative agencies because courts are not unaware that vast areas of government formerly within their control have been handed over to administrative agencies. J. Landis, The Administrative Process, 123 (1938). Fact-finding by trained and specialized administrators, provided that it is reasonable looking at the whole record, is now firmly established. Congress has excluded the courts from the fact-finding process and any attempt to turn the clock back and renew the contest by reinsinuating the judiciary into the area now reserved to executive expertise should be sharply rejected. The power of a court in effectuating the purpose of judicial review generally is narrowly drawn. Courts must defer to the action taken by the agency, which is presumed to be valid. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Within these bounds, a reviewing court must undertake a searching inquiry to ascertain whether the agency has given reasons that connect the facts it found to the choice made. To permit intelligent judicial review an agency must indicate the basis on which it exercised its expert discretion. SEC v. Chenery Corp., 318 U.S. 80, 94-95, 63 S.Ct. 454, 462-63, 87 L.Ed. 626 (1943).
 
 
 38
 Normally, an agency's action is held to be arbitrary and capricious when it relies on factors Congress did not want considered, or utterly fails to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation--as is apt here--is so implausible that it cannot be ascribed to differing views or agency expertise. See Motor Vehicles Mfrs. Assn. v. State Farm Mut., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). While a reviewing court may not supply the basis for the agency's decision--lest it interfere with matters entrusted to the executive branch--it will uphold a decision of less than ideal clarity if the "path which [the agency] followed can be discerned." Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945). See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). With the recited rules of review in mind, we discuss the issues raised on this appeal.
 
 IV DE NOVO REVIEW BY THE DISTRICT COURT
 
 39
 Title 5 U.S.C. Sec. 706(2)(F) requires that "[t]he reviewing court shall--hold unlawful and set aside agency action, findings, and conclusions found to be--unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." "[De] novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions." Camp v. Pitts, 411 U.S. 138, 141-42, 93 S.Ct. 1241, 1243-44, 36 L.Ed.2d 106 (1973) (per curiam) citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 415, 91 S.Ct. at 823. This case raises neither of these two instances. The permit determination is not adjudicatory and the Sierra Club did not bring this litigation in support of the Corps' actions.
 
 
 40
 In contrast plenary review, which is more limited than de novo review, is permitted when the agency's record is so sparse as to make judicial review ineffectual. Courts cannot intelligently perform their reviewing function if an administrative record is inadequate, incomplete or, as here, inconsistent. Pitts, 411 U.S. at 142, 93 S.Ct. at 1244. As a consequence, through plenary review a district court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." Id. at 13, 93 S.Ct. at 1244. See also, Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 420, 91 S.Ct. at 825; County of Suffolk v. Secretary of Interior, 562 F.2d 1368 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); Natural Resources Defense Council Inc. v. Callaway, 524 F.2d 79 (2d Cir.1975); Environmental Defense Fund v. Costle, 657 F.2d 275, 284 (D.C.Cir.1981).
 
 
 41
 The district court here undertook de novo review. By allowing the plaintiffs to call their own expert witnesses, and by substituting those witnesses' interpretation of the data for the views of the experts that the Corps had relied upon, the district court moved from a plenary "filling in" of holes in the Corps presentation to a de novo hearing on the fisheries issue.
 
 
 42
 Ordinarily, such de novo review would be an error requiring reversal. We do not approve such review by a district court whenever it believes that an administrative record is incomplete. But this abuse of discretion is not reversible error in the instant case. There are two reasons for us to so conclude. First, through its own actions, the Corps violated the prior recordkeeping order; this made judicial review ineffectual and further weakened the Corps' credibility regarding its decisions on Westway. Second, absent an explanation for the change from the DSEIS to the FSEIS, the administrative record did not support the granting of a permit, inasmuch as the DSEIS recited the significant adverse impact to the striped bass making the permit's issuance plainly in violation of the Clean Water Act.
 
 
 43
 Further, we observe that if the FSEIS had been published as the initial product, we might have concluded that it did address the issues and presented a reasoned judgment that the landfill impact of Westway would have a minimal effect on the juvenile striped bass. But we are not writing on a clean slate and are unable to blind ourselves to what happened in the past. After our 1983 decision upholding rejection of the first FEIS, we directed the Corps to reexamine the striped bass problem and to keep careful records. Again, if the Corps had kept such records and in reassessing the data had found reasonable grounds to reach this remarkably changed conclusion, it might have been persuasive. Instead, the Corps attempted to convince the district court and us that there was no change, and that the language of the draft report and the final report meant the same thing.
 
 
 44
 The Corps' attempted to defend this position by arguing that in using the word "significant" in the DSEIS it was employing a term of art that is defined as "measurable but minor." Yet the 404(b)(1) Guidelines state that:
 
 
 45
 Except as provided under section 404(b)(2), "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States ... Under these Guidelines, effects contributing to significant degradation ... include:
 
 
 46
 (1) Significantly adverse effects of the discharge ... on human health or welfare, including but not limited to effects on ... fish, shellfish, wildlife, and special aquatic sites.
 
 
 47
 (3) Significantly adverse effects ... on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat...."
 
 
 48
 40 C.F.R. Sec. 230.10(c) (emphasis supplied).
 
 
 49
 Plainly, the word "significant" as used in the regulatory context under which the Corps operates means important, major or consequential. Moreover, the use of the word "significant" signals that the issuance of a landfill permit would be a violation of the Clean Water Act. No court should allow the use of semantics to succeed in an attempt at glossing over an environmental violation. Neither Judge Griesa nor we are required to defer to the Corps' Orwellian-like "doublespeak," particularly when it is remembered that a primary purpose of these reports is to inform the public and provide a basis for future environmental decisions by other governmental agencies. Thus, the change from "significant adverse impact" to "minor impacts" required an explanation and that explanation should have been in the final report. Neglecting to include it illustrates again the insight of Franklin's maxim that "a little neglect may breed great mischief." B. Franklin, Maxims ... Prefixed to Poor Richard's Almanac (1758).
 
 
 50
 In sum, once the district court was satisfied that there was an illogical change, unexplained in the final report, and unjustified by the administrative record when read in the context of the history of these proceedings, the district court should at that point have remanded the matter to the Corps to revise its FSEIS by including an explanation. At most, the district court should have held a brief plenary hearing to obtain an explanation. Thus, there was no need for the protracted evidentiary hearing conducted by the trial court, particularly in view of the fact that the result reached after such lengthy trial was the same as that which could have been reached earlier. But regardless of the propriety of its entering upon a lengthy trial de novo, we agree with the district court's conclusion that the FSEIS did not satisfy the requirements of either NEPA or the Clean Water Act.
 
 
 51
 V SUBSTITUTION BY THE DISTRICT COURT OF ITS JUDGMENT
 
 
 52
 Here the district court impermissibly substituted its judgment for that of the Corps and the FHWA. In some respects the Corps brought this on itself. In 1977 when it authored its first final EIS, it adopted a conclusion that there was no Hudson River fish life in the proposed Westway landfill area. To say the least, this was an understatement. More accurately it could be characterized as false. The federal defendants were properly charged with this deviation from their duty to present facts, not fiction, in support of their choice. The Corps' careless presentation prompted the district court in its April 14, 1984 order to take the unusual step of directing it to keep records of all "activities, deliberations and communications" during any reconsideration of the Westway landfill permit.
 
 
 53
 Perhaps the trial court's dissatisfaction with the Corps' failure to abide by the earlier record keeping order drew the trial judge too deeply into the executive agency's privileged internal processes. Whatever the reason, the district court exceeded its power of review by evaluating and finding the Corps' expert witness not credible. It took testimony from other purportedly expert witnesses and found that they possessed a "high degree of expertise" and that their knowledge of the fisheries issue was "profound" and in "sharp contrast" to the Corps' expert.
 
 
 54
 Moreover, when the Secretary of the Army decided to conduct a four instead of 17 month study of the bass, the trial court found it inadequate. But, the defendants' decision that essentially balanced the quality of the data sought to be obtained against the cost of acquiring it, is one that lies peculiarly within the agency's discretion. In undertaking to weigh the relative merits of scientific evidence on the fisheries issue and finding the study time inadequate, the district court improperly decided substantive issues and impermissibly interjected itself into an area reserved to the executive agency.
 
 VI REMAINING ISSUES
 
 55
 A. Consideration of the Views of the Resource Agencies
 
 
 56
 In addition, it appears from the summary of its findings that the district court apparently concluded that the Corps failed to give adequate consideration to the views of the U.S. Fish & Wildlife Service, National Marine Fisheries Service, the U.S. Environmental Protection Agency and the New York Department of Environmental Conservation, the state agency responsible for fish and wildlife. All of these agencies were opposed to granting the landfill permit and recommended to the Corps that it be denied.
 
 
 57
 The "public interest review" regulations require that the Corps give "full consideration" to these agencies' views "in deciding the issuance, denial, or conditioning of individual or general permits." 33 C.F.R. Sec. 320.4(c). 49 Fed.Reg. 39482 (October 4, 1984). Under these regulations the Corps is not bound to agree with the conclusions reached by these resource agencies, but simply required to listen to and consider their views in the decisionmaking process. See, e.g., Corps of Engineers v. National Marine Service, Inc., 764 F.2d 445, 452 (7th Cir.1985); Sierra Club v. Alexander, 484 F.Supp. 455, 469-70 (N.D.N.Y.), aff'd without opinion, 633 F.2d 206 (2d Cir.1980). The trial judge recognized this when he stated that "the Corps was not required to accept the views of these agencies as binding, but serious consideration was warranted."
 
 
 58
 In this case, the Corps solicited the other federal and state resource agencies' views, encouraged their participation in the remand process, and gave full consideration to their comments on both the DSEIS and FSEIS, all of which is evident from the detailed responses that the Corps prepared in assessing those agencies' comments. Thus, that consideration called for under the cited regulations was given. We see no need to comment further on this issue since despite the district court's statement it actually made no direct finding that the Corps did not seriously consider the contrary scientific opinions expressed by the resource agencies. In any event, the record is plain that it did.
 
 
 59
 B. Disclosure of Information Relating to Practicable Alternatives to Westway
 
 
 60
 The district court found that the FSEIS did not "fairly disclose the issue" of Westway to the public. The particular omission cited in the ruling was a presentation of whether vast sums of money should be spent to build a six-lane highway and redevelopment project as opposed to revitalizing an existing road for a modest sum ($46 million), with a substantial "trade-in" of federal funds to be used for mass transit. Under NEPA, exhaustive detail regarding reasonable alternatives is not called for, rather only the furnishing of that information needed to "enable those who did not have a part in [the EIS] compilation to understand and consider meaningfully the factors involved" is necessary. County of Suffolk, 562 F.2d at 1375.
 
 
 61
 The short answer is that the FSEIS met NEPA's test with respect to setting forth reasonable alternatives to the highway project. Although there were no reasonable alternatives suggested to the redevelopment aspect of Westway, a great deal has already been publicly reported on that score. In fact, this vigorously contested litigation over a proposed public works project of the scope and notoriety of Westway has generated paper by the ton and ink by the carload. To believe that the public has remained somehow uninformed about the alternative of a smaller-scale road with the possibility of trade-in funds in lieu of federal Westway funding is farfetched. As the trial judge found that reasonable alternatives were set forth in the FSEIS, even though he viewed them "by no means emphasized," his responsibility on this issue ended. The further lengthy analysis, fact-finding and conclusions reached exceeded the district court's boundaries of limited review with respect to an executive agency's choice and, as such, constituted an abuse of discretion.
 
 VII PERMANENT INJUNCTION
 
 62
 We further hold that issuing an order permanently enjoining the construction of Westway was an abuse of the district court's discretion. It is not within the power of the judiciary to bar an executive agency from making administrative decisions, assuming full, good faith compliance with the requirements of NEPA and the Clean Water Act. No authority exists to support the granting of such drastic relief. On the contrary, the Supreme Court has repeatedly held that if an administrator's action is not "sustainable on the administrative record ... then the ... decision must be vacated and the matter remanded ... [to the administrator] for further consideration." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. at 549, 98 S.Ct. at 1214; Federal Power Commission v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (per curiam); Camp v. Pitts, 411 U.S. at 143, 93 S.Ct. at 1244.
 
 
 63
 Since a court's review of administrative choices under NEPA and the Clean Water Act focuses primarily on the procedural regularity of the decision, it is not for the courts to tell the executive branch what projects they may or may not consider or how much of the taxpayers' money should be expended in an attempt to "get it right."
 
 VIII CONCLUSION
 
 64
 We affirm the district court's conclusions that the proferred denial of the change from "significant adverse impact" in the DSEIS to the "minor impact" in the FSEIS was a post-hoc rationalization unworthy of belief by this Court and that the Corps had failed to provide any reasoned explanation for the change. Nonetheless, we do not agree with the dissenter that additional field studies of the Hudson River Fishery would be required before the Corps on remand could properly grant a permit. Perhaps a fresh look at the collected data could produce a clear, logical and good faith explanation for the change. Such an effort could be plausibly advanced as within the federal defendants' discretion.
 
 
 65
 Affirming the voiding of the permit may result in condemning the Westway project to oblivion. Some will cheer that distinct possibility; others will cry over the loss of projected public benefits. The State, having no part in the failure to keep the ordered records nor responsibility for preparation of the draft and final environmental reports, may count this decision a far-reaching loss. Whether this or any court is happy with the result we reach is a matter of little or no note.
 
 
 66
 Under the statutory scheme and the Constitution, our concern is not with the fate of Westway. Congress has decreed that such a project may not proceed without an acceptable environmental impact statement. Congress' intense concern with the environment is perhaps best capsulized in its belief that man and nature are so intimately connected that to significantly degrade the waters of a river threatens not only the fish, but ultimately man as well. Thus, to forge ahead with the project--gambling on the loss of this major east coast fishery resource--may result in even greater loss. In any event, the reasons given for issuing a permit for dredging and filling 242 acres of the Hudson River now used by juvenile striped bass at least as a transitory habitat, do not reasonably connect the data found by the federal defendants to the choice they made. Therefore, the decision to issue the permit was arbitrary and capricious.
 
 
 67
 Accordingly, insofar as the judgment appealed from vacated the issuance of the federal defendants' landfill permit and the associated funding, it is affirmed. Insofar as the judgment granted a permanent injunction, it is reversed. In view of the publicized time constraints facing the State of New York, this matter is remanded directly to the federal defendants for whatever action they may now deem advisable. The mandate of this Court shall issue forthwith.
 
 
 68
 MANSFIELD, Circuit Judge (concurring in part and dissenting in part):
 
 
 69
 The record demonstrates that Westway, a long-range project that may well be in the public interest, has ironically been "roadblocked" by the U.S. Army Corps of Engineers, the very agency that might, if it had complied with its duties under the National Environmental Policy Act (NEPA) and the Clean Water Act (CWA), have paved the way for its construction. Despite the blueprint offered by our thorough analysis of its earlier errors, see Sierra Club v. United States Army Corps of Eng., 701 F.2d 1011 (2d Cir.1983) (Sierra Club ), the Corps has simply repeated them upon remand, presenting us with all the aspects of a deja vu.
 
 
 70
 In its initial EIS, the Corps tried to sweep under the rug evidence indicating that there were "significant numbers of fish in the interpier area", id. at 1023, and that the area might be an important fisheries habitat. Instead it described the site as a "biological wasteland", id. at 1019. Then, after we remanded with directions to comply with NEPA and the CWA, it concluded in its DSEIS that the proposed landfill of the interpier area would have a "significant adverse impact" on the Hudson River fishery, 2 DEIS at 42. That conclusion would have required denial of a landfill permit under the CWA. 40 C.F.R. Secs. 230.10(c), 231.2(e). Six months later, however, without any explanation or new relevant evidence, it turned full circle and concluded in its FSEIS that the impact would be "minor" and insignificant. 2 FEIS at 50-51, 65-66. This arbitrary, unreasoned flip-flop, exacerbated by the Corps' defiance of our record-keeping order, clearly violated NEPA and the CWA. Indeed, the Corps has virtually repeated the remarkably similar failure to explain a dramatic swing in its views that we found to violate NEPA in Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79 (2d Cir.1975) (change of ocean site for dumping of dredged material).
 
 
 71
 I agree that the proper remedy is not an injunction but a remand to the Corps for further proceedings in compliance with its statutory obligations. The Supreme Court has made it clear that if an administrator's action is not "sustainable on the administrative record ... then the ... decision must be vacated and the matter remanded ... [to the administrator] for further consideration." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978) (quoting Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam)). See also Federal Power Commission v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (per curiam).
 
 
 72
 I must respectfully dissent, however, from the majority's holding that the district court's review of the Corps' decision was entirely de novo and an abuse of discretion which may be excused only because of the Corps' violation of our record-keeping order and the unexplained inconsistency between the DSEIS and the FSEIS. In my view, although a portion of the district court's scrutiny of the Corps' conduct was an improper de novo review, most of its examination was fully within its power, under the Administrative Procedure Act, to review an agency's conduct for the purpose of determining whether the agency had complied with the procedural requirements of NEPA and CWA.
 
 
 73
 "De novo " review is substantive in character. It occurs when a court refuses to defer to an administrative body's decision but, starting afresh, conducts an evidentiary hearing for the purpose of deciding what decision the agency should have reached. In essence the court substitutes its view of the merits for that of the agency. Camp v. Pitts, supra, 411 U.S. at 142, 93 S.Ct. at 1244; Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414-15, 91 S.Ct. 814, 822-23, 28 L.Ed.2d 136 (1971). A de novo review is permissible only "when the action is adjudicatory in nature and the agency fact finding procedures are inadequate [or] ... when issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action." Id. at 415, 91 S.Ct. at 823. See also Camp, supra, 411 U.S. at 142, 93 S.Ct. at 1244. It is not warranted by an agency's "failure to explain administrative action." Id. at 142-43, 93 S.Ct. at 1244.
 
 
 74
 On the other hand, under NEPA and CWA a court is empowered to make a procedural or plenary review to insure that an agency has complied with each of the steps required of it by relevant statutes and regulations and "has taken a 'hardlook' at environmental consequences" of its actions. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). See also Sierra Club, supra, 701 F.2d at 1029. Implicit in that obligation is a duty to make an adequate compilation of relevant information, to analyze it reasonably and, perhaps most importantly, not to ignore "pertinent data." Id. at 1029.
 
 
 75
 A procedural review is called for when the administrative record or evidence proffered by others suggests that the agency has violated its basic duties under NEPA. It is triggered when the record (1) fails to disclose the reasons for the agency's action, Camp, supra, 411 U.S. at 143, 93 S.Ct. at 1244; Overton Park, supra, 401 U.S. at 420, 91 S.Ct. at 825; (2) fails to show that the agency obtained and adequately considered available, relevant, material evidence, Sierra Club, supra, 701 F.2d at 1029; or (3) demonstrates that the EIS contains some glaring sin of omission or other defect, County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1384 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). In considering whether the nature and depth of the agency's investigation was adequate this court looks to a range of factors, including "(1) whether obtaining more detailed useful information on the topic ... is 'meaningfully possible' ... and (2) how important it is to have the additional information." County of Suffolk, supra, 562 F.2d at 1378. In short, the court considers, among other factors, the importance and weight of the additional evidence, the difficulty and cost involved in obtaining it, and the extent to which it would be merely cumulative.
 
 
 76
 Obviously, because a procedural review considers how the administrative record was developed and whether, once developed, it was complete, judicial scrutiny of the agency's activities is not limited to the record alone. Camp, supra, 411 U.S. at 143, 93 S.Ct. at 1244; Overton Park, supra, 401 U.S. at 420, 91 S.Ct. at 825. Rather, the courts may conduct "a thorough, probing, in-depth review" of what the agency did and why. Id. at 415, 91 S.Ct. at 823. To do so it may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary," Camp, supra, 411 U.S. at 143, 93 S.Ct. at 1244, and "require the administrative officials who participated in the decision to give testimony explaining their action." Overton Park, supra, 401 U.S. at 420, 91 S.Ct. at 825. As we have recognized time and again:
 
 
 77
 "[A]llegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticism ... under the rug' ... raise issues sufficiently important to permit the introduction of new evidence in the district court ... in challenges to the sufficiency of an environmental impact statement ..." Citizens for Balanced Environment v. Volpe, 650 F.2d 455, 461 (2d Cir.1981) quoting County of Suffolk, supra, 562 F.2d at 1368).
 
 
 78
 A procedural review, however, has firm borders. It is deep, but not broad. The court may, for example, judge the credibility of witnesses, but only as their testimony affects procedural issues. It may not substitute its view of the merits or of "the choice of action to be taken" for the agency's. Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (per curiam); Vermont Yankee, supra, 435 U.S. at 558, 98 S.Ct. at 1219. It is the agency's province to decide what the executive should do and the court's function to insure that the decision was rooted in careful consideration of all relevant factors and reached only after the relevant evidence and agency's rationale were put before the public. Sierra Club, supra, 701 F.2d at 1029.
 
 
 79
 Applying these principles here, I cannot agree with the majority that Judge Griesa's evidentiary hearing amounted entirely to an impermissible de novo review of the Corps' conduct. (See Maj.Op. 1052). Indeed, if that were the case, Camp and Overton Park would require us to reverse his decision, not affirm it in substantial part.
 
 
 80
 In my view the district court conducted a permissible procedural review of certain matters: (1) the Corps' unexplained "flip-flop" in which it adopted a FSEIS that reached conclusions that were diametrically opposed to those stated in its DSEIS without any rational explanation for the about-face, (2) the Corps' failure to follow its consultants' almost unanimous recommendation that it obtain a 17-month, 2-winter study of the relevant fishery habitat before deciding whether Westway would have a significant adverse effect on the fishery; (3) the Corps' failure to explain why it did not use the "overwintering" theory in its "worst case" analysis of fishery impact, and (4) the claim that the FSEIS made an inadequate disclosure of whether any alternatives existed that would provide the redevelopment benefits offered by Westway. On the other hand, I agree with the majority that Judge Griesa made an impermissible de novo review of whether the Corps failed to consult adequately with the United States Fish and Wildlife Service (FWS), the National Marine Fisheries Service (NMFS), and the New York Department of Environmental Conservation.
 
 
 81
 Although I agree with the majority opinion's analysis of the Corps' failure to explain its radical change of mind between the DSEIS and FSEIS, I part company from the majority when it comes to the plaintiffs' contention that the Corps' failure to conduct a 17-month study constituted a failure to gather all data necessary to enable it intelligently to decide what impact Westway would have on the fishery. In my view this attack on the adequacy of the FSEIS is meritorious.
 
 
 82
 With near unanimity, the Corps' consultants called for, at least, a 2-winter study. Following the earlier remand of this case to the Corps, Malcolm Pirnie, Inc. was retained by the Corps to analyze existing fishery data with respect to the Westway area and to recommend whether additional fishery studies were needed to determine how many fish used that area and their movements. It produced a report recommending two studies: (1) a fish sampling program for a minimum of three years, and (2) a habitat survey for a minimum of one year. At meetings of the Corps, Malcolm Pirnie, Inc., the NMFS, the FWS and the Environmental Protection Agency (EPA), it was agreed that the study could be reduced to two winters and still gather enough data. The Corps then convened a workshop of leading experts in striped bass ecology, sampling design, statistics and hydro-acoustics to consider the matter and, after thorough review and further consultation with the FWS, NMFS and the EPA, it was the unanimous view of all that there should be a 17-month, 2-winter study of the fishery habitat during the period from December 1982 to April 1984, to determine how many fish used the Westway site and their movements.
 
 
 83
 When the New York Department of Transportation objected to the proposed study, Col. Fletcher H. Griffis, District Corps Engineer, in July 1983 convened a second workshop of some 39 persons, including representatives of the Corps, FWS, NMFS, EPA, New York Department of Conservation, New Jersey Department of Environmental Protection and many of the independent experts who had attended the 1982 workshop. A majority of the participants approved the 1982 proposal for a 17-month, 2-winter study, which would commence in December 1983. The Governor of New York, however, registered his objection with the Secretary of the Army, and Col. Griffis' decision to go forward with the study was in short order countermanded, without explanation, by the Chief of Army Engineers, based on the conclusion of a specially selected Task Force that did not include any of the experts who had favored the 2-winter study. Accordingly, the Corps was only permitted to make a study lasting through the remainder of the 1983-84 winter, i.e., from December 1983 to April 1984.
 
 
 84
 If the Corps had implemented its own original 1982 proposal for a 17-month, 2-winter study, that study could have been completed by April 1984. Instead, the truncated study left crucial questions unanswered, demonstrating that the advocates of the 17-month study had been correct. The role Westway played in the bass' life cycle, where the bass went when they were not in the area, and how often they used it, were left unresolved. Another winter's study would have allowed the Corps to use tagging and recapture procedures to gather reliable data to replace the speculation with which it answered these crucial questions in the DSEIS and FSEIS. In my view, the Corps' failure to obtain this pertinent evidence rendered its FSEIS inadequate, incomplete and a violation of NEPA.
 
 
 85
 Perhaps the clearest illustration of how the Corps' failure to get essential facts tainted the environmental impact statements was its elimination of the "overwintering" theory as a base for its "worst case" analysis. 40 C.F.R. Sec. 1502.22(b)'s requirement that the Corps carry out a worst case analysis "requires [that] impact statements, at a minimum, contain information to alert the public and Congress to all known possible environmental consequences of agency action." Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed.Reg. 18,026, 18,032 (1981) (answer to Question 20b) (emphasis in original). See also Sierra Club v. Sigler, 695 F.2d 957, 971-72 (5th Cir.1983). In preparing its worst case analysis, however, the Corps dismissed the possibility that bass overwinter in Westway and adopted the "migratory theory," which assumed that the bass leave Westway and move out to sea in mid-winter. The Corps' study, however, had found few juvenile bass in the areas to which they had supposedly migrated but showed, on the contrary, that significant numbers of the fish were in Westway throughout the winter. It is ludicrous to think that the Corps fulfilled its obligation to produce a worst case analysis when it rejected, in the face of such contradictory evidence, the possibility that the bass over-wintered in, rather than migrated through, Westway. The district court's findings that the Corps did not give "full consideration" to the views of the FWS, NMFS and EPA, and that the FSEIS improperly enlarged the scope of Westway and failed to consider alternatives to its redevelopment aspects, stand on a different footing. With respect to the latter, Judge Griesa's conclusion is at odds with the evidence. Whether one labels his review "de novo" or "procedural," his findings are not supported by substantial evidence but, on the contrary, are plainly wrong. In addition, the record reveals that the Corps considered the views of all other relevant agencies; Judge Griesa's decision that its consideration was inadequate amounted to an impermissible substitution of his view for the discretion vested in the Corps.
 
 
 86
 Lastly, I believe it will be well nigh impossible upon remand for the Corps, having already found in its DSEIS on the present record that Westway would have a "significant adverse impact" on the Hudson River fishery, to explain another about-face without obtaining additional evidence as to the quantity and movements of fish in the estuary. Some may view the resultant delay as an unfortunate blow to New York City's future. If it is, the statutory provisions by which we are governed, as construed by the Supreme Court, leave little doubt that the remedy, short of further field study by the Corps, lies with Congress, not the courts.