**In re WHEELING–PITTSBURGH STEEL CORP., et al., Debtor.**

**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, and Wheeling–Pittsburgh Steel Corporation, et al., Plaintiffs,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Defendant.**

Civ. A. No. 87–355.
Bankruptcy No. 85–793 PGH.
Adv. No. 88–19.

United States District Court,
W.D. Pennsylvania.

July 5, 1989.

Carol Connor Flowe and Charles G. Cole, Washington, D.C., for Pension Benefit Guar. Corp.

Baruch Fellner, William J. Kilberg, Washington, D.C., and Bruce McCullough, Pittsburgh, Pa., for debtor.

Peter Shinovar, New York City, and Paul Whitehead, Pittsburgh, Pa., for United Steelworkers of America.

Joel Walker, Pittsburgh, Pa., and Dennis Cronin, New York City, for informal committee of bank creditors.

Robert G. Sable, and Lawrence M. Handelsman, Pittsburgh, Pa., for Official Committee of Unsecured Creditors.

### ORDER DENYING PRELIMINARY INJUNCTION AND GRANTING TEMPORARY RELIEF

SIMMONS, District Judge.

This 5th day of July, 1989, upon consideration of the record and the recommended findings of fact and conclusions of law submitted by the Bankruptcy Court in con-

nection with Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion for Preliminary Injunction, and after hearing argument of counsel, it is ORDERED as follows:

1. The MOTION FOR PRELIMINARY INJUNCTION filed by the plaintiff, United Steelworkers of America, AFL-CIO-CLC (the "Union"), and plaintiff/debtors, Wheeling-Pittsburgh Steel Corporation and its wholly owned subsidiaries, Pittsburgh-Canfield Corporation and Monessen Southwestern Railway Company, (collectively "Wheeling-Pittsburgh") filed June 8, 1989, shall be, and it hereby is, denied;

2. Preliminarily and temporarily, pending a final determination of Civil Action No. 87-355, plaintiffs' EMERGENCY MOTION FILED WITH THIS COURT JULY 5, 1989 FOR PRELIMINARY, DECLARATORY AND INJUNCTIVE RELIEF IS GRANTED.

3. Plaintiffs, the Union and Wheeling-Pittsburgh, are free to implement the proposed USWA-Wheeling-Pittsburgh Steel Corporation Employees Supplemental Retirement Plan (Exhibit K to the Massco Declaration), and Wheeling-Pittsburgh Steel Corporation Salaried Employees Supplemental Retirement Plan (Exhibit L to the Massco Declaration) (the "Follow-On Programs");

4. Such implementation appears to be consistent with Title IV of the Employee Retirement Income Security Act of 1974, as amended, the Termination Agreement among the Union, Wheeling-Pittsburgh and the Pension Benefit Guaranty Corporation ("PBGC"), the Termination Agreement between Wheeling-Pittsburgh and the PBGC, and all other applicable law; and

5. On the facts of record in the above matter, the PBGC is without the statutory authority to, and may not, restore in whole or in part Wheeling-Pittsburgh's terminated defined benefit pension plans or the assets and liabilities thereof, solely on the basis of implementation of the USWA-Wheeling-Pittsburgh Steel Corporation Supplemental Retirement Plan (the Union Follow-On Plan—Exhibit K to the Massco Declaration) and/or the Wheeling-Pittsburgh Steel Corporation Salaried Employees Supplemental Retirement Plan (the Salaried Follow-On Plan-Exhibit L to the Massco Declaration).

6. Payments of Follow-On Plan benefits shall be deemed to be made pursuant to an order of the United States District Court in accordance and compliance with the terms of paragraph 3 of the Termination Agreements.

7. The within order shall terminate upon the issuance of a final judicial order concluding Civil Action No. 87-355, in this District Court.

UNITED STATES BANKRUPTCY
COURT FOR THE WESTERN
DISTRICT OF PENNSYLVANIA

June 30, 1989.

WARREN W. BENTZ, Bankruptcy Judge.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| OPINION |  | 676 |
| (i) | Issues | 676 |
| (ii) | Jurisdiction | 676 |
| (iii) | Facts | 677 |
| (iv) | Discussion | 679 |
| I. | DECLARATORY RELIEF—SUMMARY JUDGMENT | 679 |
|  | A. PBGC AND TITLE IV OF ERISA | 679 |
|  | B. FINANCIAL DIFFICULTIES | 680 |
|  | C. THE MERITS | 681 |
|  | 1. PBGC Action | 681 |
|  | 2. Summary Judgment | 681 |

| | | Page |
|---|---|---|
| | 3. The Follow–On Plans under ERISA | 682 |
| | 4. Voluntary or Involuntary Termination | 684 |
| | 5. PBGC's Concern | 685 |
| | 6. PBGC Arguments | 686 |
| | 7. Re-termination | 688 |
| | D. MOTION FOR PRELIMINARY INJUNCTION | 688 |
| II. | APPROVAL OF PBGC SETTLEMENT | 690 |
| III. | OBJECTIONS TO IRS PROOFS OF CLAIM | 691 |
| | A. PRELIMINARY STATEMENT | 691 |
| | B. CASE SUMMARY | 691 |
| | C. ISSUES PRESENTED | 692 |
| | D. THE MERITS | 692 |
| | 1. Revocation of Waivers | 692 |
| | 2. Assessments—1984 and 1985 | 693 |
| | 3. Correction | 694 |
| IV. | CONCLUSIONS | 695 |

## OPINION

### Recommended Findings and Conclusions

#### (i) Issues

The above combined causes present the following issues:

(a) Whether implementation of the supplementary or "Follow–On" defined contribution pension plans bargained for by Wheeling–Pittsburgh and the Union, which follow termination of underfunded defined benefit pension plans, constitutes a sufficient basis for PBGC to restore (or de-terminate) the terminated pension plans, thereby reimposing on Wheeling–Pittsburgh the full liability of the terminated plans.

(b) Whether the court should grant the Motion for Preliminary Injunction filed by the Union and Wheeling–Pittsburgh on June 9, 1989, seeking an order prohibiting PBGC from taking any action to restore the terminated pension plans pending a final determination of the above issue, so as to allow interim benefit payments to be made under the temporary VEBA programs, to retirees and other beneficiaries notwithstanding the agreement of the Union and Wheeling–Pittsburgh not to make such payments.

(c) Whether the agreement between PBGC and Wheeling–Pittsburgh settling the proofs of claim filed by PBGC in the above bankruptcy should be approved by the court. (Excluded from the settlement are (1) the "Follow–On" program litigation, and the motion for preliminary injunction related thereto, (2) PBGC's rights as a holder of Series A and Series B Preferred Stock of Wheeling–Pittsburgh, and (3) the excise tax claims of the IRS related to pension plan underfunding.)

(d) Whether the objection of Wheeling–Pittsburgh to the proofs of claim of the U.S.A., Internal Revenue Service, should be sustained in whole or in part, where the claim is for "excise taxes" imposed because of Wheeling–Pittsburgh's failure to properly fund the now terminated defined benefit pension plans.

#### (ii) Jurisdiction

The District Court has jurisdiction of Civil Action No. 85–355 (action for declaratory relief—the "Follow–On" Plan Litigation) pursuant to:

(a) § 4003(f) of the Employee Retirement Income Security Act of 1974 (ERISA) as amended by the Single Employer Pension Plan Amendments Act of 1986, 29 U.S.C. § 1303(f), and

(b) §§ 1331, 1337 and 2201 of the Judicial Code, 28 U.S.C. §§ 1331, 1337 and 2201.

The Bankruptcy Court has jurisdiction of Civil Action No. 85–355 (the "Follow–On" Plan Litigation) pursuant to the special order of reference of the District Court dated January 7, 1988, but only to make proposed

findings of fact and conclusions of law,[1] subject to *de novo* review by the District Court as to those matters to which any party has timely and specifically objected.

The matter of the PBGC proofs of claim filed in the above bankruptcy appear also to be encompassed by said order of reference, and is, in any event, so intimately related to the other matters in that action, that the question of the approval of the settlement agreement between those parties is also a matter for recommended findings and conclusions.

The objections of the debtor to the proofs of claim of the IRS are within Bankruptcy Court jurisdiction as core matters under 28 U.S.C. § 157(b)(2)(B), and the General Order of Reference of October 16, 1984, but the facts, the issues and the practical impact on the debtor and its creditors are so closely related to the other issues herein, that it is appropriate that they be resolved together. Hence, we limit ourselves to the making of recommended findings and conclusions.

### (iii) Facts

On November 8, 1985, seven defined benefit pension plans covering employees of plaintiffs/debtors, Wheeling–Pittsburgh Steel Corporation, and its wholly owned subsidiaries, Pittsburgh–Canfield Corporation and the Monessen Southwestern Railway Company (collectively, "Wheeling–Pittsburgh"), were terminated with the approval of the court. The pension plan terminations followed a three month strike by plaintiff, the United Steelworkers of America, AFL–CIO–CLC (the "Union"). The strike had been precipitated when Wheeling–Pittsburgh imposed wage reductions on July 21, 1985 following a lengthy trial after which the Bankruptcy Court permitted the existing collective bargaining agreements to be "rejected" under § 1113 of the Bankruptcy Code upon a finding,

inter alia, that such rejection was necessary in order to achieve a reorganization. The pension plans were tied to the rejected collective bargaining agreements. In the 1985 (Strike) Settlement Agreement, reached on October 15, 1985, Wheeling–Pittsburgh and the Union agreed to an arrangement whereby some, but not all, of the benefits lost to retirees as a result of the pension plan terminations, to the extent they were not insured by defendant, the Pension Benefit Guaranty Corporation ("PBGC"), would be made up under a Pensioners' Relief Program, to be funded through a collectively-bargained contribution of $1.05 per hour worked.

Pursuant to the Pensioners' Relief Program, the Union and Wheeling–Pittsburgh established a Voluntary Employee Benefit Association ("VEBA") which would receive a portion of the $1.05 per hour, and make relief payments until a permanent solution would be implemented. The PBGC consented to this arrangement (without prejudice to its position) for a limited period of time in agreements (the "Termination Agreements") dated August 19, 1986. That time, including extensions, expired June 19, 1989.

Wheeling–Pittsburgh and its subsidiaries had filed for relief under Chapter 11 of the Bankruptcy Code on April 16, 1985. On October 7, 1985, prior to the strike settlement, the Bank creditors filed a motion with the Bankruptcy Court seeking an order rejecting the defined benefit pension plans as executory contracts under 11 U.S.C. § 365, on the grounds that the plans were an undue burden on the estate and that continuation of the plans would preclude any chance for a successful reorganization.[2]

On September 5, 1985, also before the strike settlement, the PBGC had filed in

---

1. This opinion constitutes recommended findings of fact and conclusions of law of the Bankruptcy Court pursuant to 28 U.S.C. § 157(c).

2. That matter was withdrawn to the District Court (Civil Action No. 85–2406) and the court ordered the approval of the rejection of the Pension Plans, but reserved all issues relative to the effect of such rejection, including PBGC

claims and the priority thereof. Upon approval of the stipulation of settlement of PBGC proofs of claim, infra, Civil Action No. 85–2406 will be concluded, except as to the motion of United Transportation Union therein, as to which all issues are reserved and will be addressed as a separate matter.

the District Court a complaint seeking the appointment of a statutory interim pension plan trustee (Civil Action No. 85–2030). Since PBGC trusteed the pension plans pursuant to the Termination Agreements of August 19, 1986, between PBGC, Wheeling–Pittsburgh and the Union, that action, being Civil Action No. 85–2030, is moot and will be dismissed.

The 1985 (Strike) Settlement Agreement reached on October 15, 1985, which provided for $1.05 per hour to be contributed to a Pensioners' Relief Fund, also provided for a committee to consider the best manner to achieve its intended purposes. The committee created a dual program which:

(1) provided benefits based on future service for active Union employees (adopted as the "USWA–Wheeling–Pittsburgh Steel Corporation Employees' Retirement Security Plan," see Exhibit B to Massco Declaration);

(2) provided temporary cash assistance to retired Union employees and beneficiaries adversely affected by termination of the plans (adopted as the "USWA–Wheeling–Pittsburgh Steel Corporation Relief Plan," see Exhibit C of the Massco Declaration—also known as the Voluntary Employee Benefit Association plan, or the "VEBA").

As anticipated, the committee formulated a permanent "Follow–On Plan" to replace the temporary VEBAs and providing substantially the same benefits as the VEBAs.

Programs for salaried workers parallel those for Union workers and the issues as to them are the same.

The agreements dated August 19, 1986 between Wheeling–Pittsburgh and PBGC (Exhibits G, H, I and J to the Massco Declaration—also known as the Termination Agreements) provided:

(1) that the defined benefit pension plans terminated "not later than November 8, 1985";[3]

(2) that PBGC shall assume trusteeship of the plans;

(3) that the VEBAs will be terminated on the earlier of August 19, 1988, (now extended to June 19, 1989) or the approval of a reorganization disclosure statement for Wheeling–Pittsburgh; and

(4) that Wheeling–Pittsburgh would not implement any "Follow–On" pension plan (which would replace the VEBAs) without

(a) PBGC agreement, or

(b) an order of the U.S. District Court.

Thus, the parties here have framed the issue for the court and have avoided the risk of actual restoration of the terminated plans; if the U.S. District Court order cannot be obtained, the Follow–On Plans simply will not be implemented.

The Follow–On Plans (Exhibit K to the Massco Declaration, formally entitled "USWA–Wheeling–Pittsburgh Steel Corporation Employees' Supplemental Retirement Plan," and Exhibit L, formally entitled "Wheeling–Pittsburgh Steel Corporation Salaried Employees' Supplemental Retirement Plan"), like the temporary VEBAs, are designed to replace some, but not all, of the unguaranteed benefits lost through plan termination. Exhibits K and L have been agreed to by the Union and Wheeling–Pittsburgh, and signed but not implemented.

Employees have lost completely the "30 and out" early retirement pension benefits, disability and surviving spouse benefits, and shutdown benefits.

PBGC notified Wheeling–Pittsburgh and the Union by letter of December 17, 1987, that it disapproved of the Follow–On Plans, and that implementation thereof will compel PBGC to "restore," or de-terminate the terminated plans, and reimpose the unfunded liabilities thereof upon Wheeling–Pittsburgh.

The Union and Wheeling–Pittsburgh therefore brought the within Action for Declaratory Judgment and filed a Motion for Summary Judgment, so as to obtain the order of the U.S. District Court permitting such implementation, as contemplated by the Termination Agreements.

---

**3.** The termination date of the plans is now established as November 8, 1985.

Payments under the VEBAs have been made until now, and the Union and Wheeling–Pittsburgh desire to continue them. Since the VEBAs provide benefits similar to the Follow–On plans, Wheeling–Pittsburgh and the Union do risk unilateral PBGC action restoring to Wheeling–Pittsburgh the liabilities of the terminated plans if payments under the VEBAs are now continued. Also, continuation of the VEBAs is in violation of the Termination Agreements. Hence, the Union and Wheeling–Pittsburgh, by their Motion for Preliminary Injunction, seek an order of the U.S. District Court enabling distributions under the VEBAs to be made temporarily until a U.S. District Court order is issued on the merits as to the Follow–On Plans in the action for declaratory relief.

(iv) Discussion

I. DECLARATORY RELIEF—SUMMARY JUDGMENT

A. PBGC AND TITLE IV OF ERISA

In *PBGC v. LTV Corporation*, 875 F.2d 1008, 1010–11 (2nd Cir.1989), the Court of Appeals explains: [4]

> The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1101–1461 (1982 & Supp. IV 1986), *as amended by* the Single–Employer Pension Plan Amendments Act of 1986 (SEPPAA), Pub.L. No. 99–272, 100 Stat. 237, governs the maintenance and administration of employee pension plans. PBGC is a wholly owned United States government corporation which serves as a national insurer of pension plans. It was created under ERISA section 4002, 29 U.S.C. § 1302, "(1) to encourage the continuation and maintenance of voluntary private pension plans ..., (2) to provide for the timely and uninterrupted payment of pension benefits to [plan] participants and beneficiaries ..., and (3) to maintain premiums established by the corporation ... at the lowest level consistent with carrying out its obligations."

Under ERISA, single-employer pension plans may be voluntarily terminated under certain circumstances by plan administrators under ERISA section 4041, 29 U.S.C. § 1341. They also may be involuntarily terminated by PBGC under ERISA section 4042, 29 U.S.C. § 1342, for various reasons such as the employer's inability to adequately fund the benefit programs. PBGC is required to guarantee payment of non-forfeitable benefits under terminated plans, subject to certain limitations. *See* ERISA sections 4022, 4022B, 4061, 29 U.S.C. §§ 1322, 1322b, 1361. To finance the payment of these benefits, PBGC uses funding obtained from two sources: (1) the annual insurance premiums paid by the administrators of covered plans pursuant to sections 4006 and 4007 of ERISA, 29 U.S.C. §§ 1306, 1307, and (2) the employer liability payments collected under section 4062 of ERISA, 29 U.S.C. § 1362, which makes employers whose plans terminate with insufficient assets liable to PBGC for part of the terminated plan's unfunded guaranteed benefits, *see* 29 U.S.C. § 1362(b).

Section 4047 of ERISA, 29 U.S.C. § 1347, provides for the restoration of plans that have been terminated. Specifically, section 4047 provides, in pertinent part:

> In the case of a plan which has been terminated under section 1341 or 1342 of this title [PBGC] is authorized in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under this subchapter, to take such action as may be necessary to restore the plan to its pre-termination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

Whether PBGC properly exercised this restoration authority is the focal point of the instant dispute.

---

**4.** The 2nd Circuit opinion in *LTV* is authoritative, directly on point, and so cleanly and clearly drafted, that we have not the temerity to attempt an improvement. Nor do we think it appropriate to simply cite the *LTV* opinion, since much of the language and reasoning could well have been written on the within controversy.

(§ 1347, on November 8, 1985, referred only to § 1342. Since then, it was amended to include § 1341).

Similarly, whether PBGC may, as it has decided it will, properly exercise this restoration authority is the focal point of the within dispute.

## B. FINANCIAL DIFFICULTIES

The terminated pension plans are defined benefit plans under § 3(35) of ERISA, as amended, 29 U.S.C. § 1002(35). They have also been determined by the Secretary of the Treasury to be plans described in § 401(a) of the Internal Revenue Code, 26 U.S.C. § 401(a), and are governed by the plan termination insurance program established under Title 4 of ERISA, pursuant to § 4021(a) of ERISA, 29 U.S.C. § 1321(a).

Under the terms of the pension plans, Wheeling–Pittsburgh promised that retirees and their beneficiaries would receive fixed retirement benefits for life calculated according to specified formulas based on the participant's age, length of service and past earnings. Wheeling–Pittsburgh was to pay the cost, whatever it proved to be. Under ERISA and the Internal Revenue Code, Wheeling–Pittsburgh was obligated to make minimum funding contributions to the plans each year. The IRS has the authority to grant "waivers" which permit a plan sponsor (Wheeling–Pittsburgh) to amortize the contributions over 15 years in the event of a substantial business hardship.

Wheeling–Pittsburgh had applied for and received such waivers for the plan years 1982 and 1983 (thus indicating then a "substantial business hardship"). The IRS may specify that the failure to make any scheduled payment voids the entire funding waiver. A partial contribution was made in 1984 for the plan year 1983, but no other cash was contributed for the preceding years. When Wheeling–Pittsburgh, in 1985, asked for a waiver for the minimum funding contributions for the plan year 1984, IRS denied the request. After Wheeling–Pittsburgh filed for bankruptcy, Wheeling–Pittsburgh failed to make annual amortization payments that were required under the terms of the 1982 and 1983 funding waivers. As a result, the IRS notified Wheeling–Pittsburgh that the 1982 and 1983 conditional waivers became null and void and that Wheeling–Pittsburgh became liable for the entire amount of the unpaid contributions for those years. Wheeling–Pittsburgh has estimated that the plans had assets of under $200 million and pension liabilities of over $725 million on November 8, 1985 (or a financial shortfall of $525 million) and, if the plans had been continued, or are now restored, the funding deficiency would, by 1989, exceed $700 million. The PBGC's estimate of the funding deficiency in September, 1985, was over $400 million.

Monthly financial reports of Wheeling–Pittsburgh during this proceeding indicate that the steel market has improved, substantial profits have been earned, and confirmation of a plan of reorganization seems likely. This has been achieved, however, by freezing prepetition debt which, after extensive litigation, will total approximately $1.2 billion. No principal or interest payments have been made (except minor amounts upon fully secured claims). A proposed plan was filed in December, 1988, but no further progress toward confirmation may be made until the within dispute is resolved because of its effect upon negotiations for a new collective bargaining agreement; the 1985 (Strike) Settlement Agreement expires by its terms ten days after the entry of an order confirming a plan of reorganization.

Also, the PBGC proofs of claim and the IRS excise tax claims must be resolved because of their potential magnitude and asserted priority status.

The draft plan contemplates satisfaction of the $1.2 billion in debt by payment distribution of $500 million cash (including $85 million to PBGC in settlement of its claim, see infra) and distributions of notes and equity securities. Existing equity security holders will be reduced to a minor fraction of prior ownership. Creditors will become involuntary investors in the stock of Wheeling–Pittsburgh.

If the terminated plans are restored and a $500–700 million liability imposed upon Wheeling–Pittsburgh, requiring eventual payment in full and a substantial portion payable immediately in cash, a reorganization would not be likely. It would be more likely that creditors would opt for a liquidation, under which the terminated plans would necessarily be re-terminated, and the postpetition liability of $500–700 million would vanish (i.e., there would be no employer, no employees, no Follow–Ons, and hence, no restored plans).

## C. THE MERITS

### 1. PBGC Action

In its December 17, 1986 letter to Wheeling–Pittsburgh's attorneys (Exhibit M to Massco Declaration), the PBGC states in part:

> [W]e have determined that if Wheeling–Pittsburgh were to adopt such plans [the VEBAs and the Follow–Ons], the effect would be a de facto continuation of the previously terminated Wheeling–Pittsburgh plans.
>
> Accordingly, ... the PBGC hereby disapproves the adoption of the proposed plans.
>
> ...
>
> If Wheeling–Pittsburgh adopted such plans, ... then PBGC would be constrained to exercise its authority under § 4047 of ERISA to restore all or part of the assets and liabilities existing under the previously terminated plans.

Thus, PBGC has made its "determination" and the issue is framed for final adjudication.

In *PBGC v. LTV*, the PBGC brought an enforcement action in the District Court. Here, the financial impact upon the debtor (and its creditors and employees) if it takes action contrary to the PBGC determination, compels compliance by Wheeling–Pittsburgh. Also, PBGC and the debtor have agreed that the Follow–Ons will not be implemented without a District Court order, thus creating a matter for judicial decision on a "case stated" basis. PBGC contemplated in the Termination Agreements that this litigation must, and would, precede implementation of the Follow–On Plans then contemplated.

It is not disputed that the PBGC correspondence constituted agency action from which an adversely affected party may seek equitable relief. See 29 U.S.C. § 1303(f). Plaintiffs' Complaint seeking declaratory relief is therefore procedurally appropriate.

### 2. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. We view the evidence in the light most favorable to the non-moving party. *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). Doing so, we accept the non-movant's allegations as true and resolve any conflicts in his favor. *White v. Westinghouse Elec. Co.*, 862 F.2d 56 (3d Cir.1988). Here, there are no material facts in dispute.

Whether PBGC's determination of December 17, 1986 was made in accordance with procedures required by the Administrative Procedures Act is an issue which has not been raised here. There appears to have been no record made prior to the PBGC determination; such a record would be a prerequisite to the use of an "arbitrary and capricious" standard of review as opposed to a *de novo* review. In *PBGC v. LTV*, there was an administrative record, and the PBGC decision was "reviewable under the arbitrary and capricious standard found in 5 U.S.C. § 706(2)(A)." However, the court found an error in the application of applicable law; this resulted in the court's conclusion that the PBGC action was arbitrary and capricious. The court found that PBGC had "focused inordinately on ERISA" and had failed to adequately consider "the policies and goals" of applicable bodies of labor law and bankruptcy law and that such "failure renders PBGC's decision arbitrary and capricious."

The court also looked to the factors within the administrative record, 875 F.2d at

1016: "Even when we examine the factors upon which PBGC did base its decision, we find no support in the administrative record for the conclusion reached. Thus, the restoration decision is insupportable as a matter of law."

While we have no record before us of an administrative hearing, we do have the pleadings, affidavits, correspondence, exhibits setting forth the undisputed facts and the briefs by which PBGC explains its position.

The result hinges on a question of law and if PBGC applied the law in an erroneous manner, the result is arbitrary and capricious.

### 3. The Follow–On Plans Under ERISA

■ *PBGC v. LTV* further explains (p. 1015–16):

PBGC is an administrative agency subject to the provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq* (1982 & Supp. IV 1986), and its decisions are reviewable under the arbitrary and capricious standard found in 5 U.S.C. § 706(2)(A). Our inquiry into whether PBGC's decision was arbitrary and capricious must be based on the record that PBGC presented to the district court. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44 [105 S.Ct. 1598, 1606, 84 L.Ed.2d 643] (1985); *Camp v. Pitts,* 411 U.S. 138, 142 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971). When reviewing an agency's decision, courts must determine whether the agency took all relevant factors into consideration in arriving at the decision. *See Overton Park,* 401 U.S. at 416 [91 S.Ct. at 823]; *Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1051 (2d Cir. 1985); *New York Council, Ass'n. of Civilian Technicians v. Federal Labor Relations Authority,* 757 F.2d 502, 508 (2d Cir.), *cert. denied,* 474 U.S. 846 [106 S.Ct. 137, 88 L.Ed.2d 113] (1985). Because ERISA, bankruptcy and labor law are involved in the case at hand, there must

be a showing on the administrative record that PBGC, before reaching its decision, considered all of these areas of the law, and, to the extent possible, honored the policies underlying them.

"One of Congress' central purposes in enacting [ERISA] was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 374 [100 S.Ct. 1723, 1733, 64 L.Ed.2d 354] (1980) (quoting Senator Bentsen, 3 *Legislative History of the Employee Retirement Income Security Act of 1974,* 94th Cong., 2nd Sess. 12 [Comm. Print 1976]). Accordingly, PBGC was created to encourage the maintenance of voluntary private pension plans, ensure the uninterrupted payment of pension benefits and maintain the premiums established by PBGC at the lowest possible level. ERISA section 4002, 29 U.S.C. § 1302; *see Belland v. Pension Benefit Guaranty Corp.,* 726 F.2d 839, 843 & n. 4 (D.C.Cir.), *cert. denied,* 469 U.S. 880 [105 S.Ct. 245, 83 L.Ed.2d 183] (1984).

The purpose of a Chapter 11 reorganization under the Bankruptcy Code "is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 220, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6179.

Debtors in reorganization receive an automatic stay under section 362 of the Bankruptcy Code, 11 U.S.C. § 362, which prevents the recovery of any claim against the debtor that arose prior to the commencement of the bankruptcy case. Thus, the results of a reorganization are the shielding of a debtor from the financial pressures imposed by its creditors, and the promotion of the equitable distribution of the debtor's assets to its creditors. *See NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 [104 S.Ct. 1188, 1197, 79 L.Ed.2d 482] (1984); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203

[103 S.Ct. 2309, 2312, 76 L.Ed.2d 515] (1983).

'A fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce. Central to achievement of this purpose is the promotion of collective bargaining as a method of defusing and channeling conflict between labor and management.' *First Nat'l. Maintenance Corp. v. NLRB*, 452 U.S. 666, 674 [101 S.Ct. 2573, 2578, 69 L.Ed.2d 318] (1981) (citation omitted).

Although this case arose under ERISA, the competing policies of bankruptcy and labor law must also be accorded due weight. In fact, section 514(d) of ERISA, 29 U.S.C. § 1144(d), explicitly states that '[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(c) of this title) or any rule or regulation issued under any such law.' *See also National Stabilization Agreement of the Sheet Metal Indus. Trust Fund v. Commercial Roofing & Sheet Metal*, 655 F.2d 1218, 1223 (D.C.Cir.1981), *cert. denied*, 455 U.S. 909 [102 S.Ct. 1256, 71 L.Ed.2d 447] (1982). Thus, here, the policies and goals of ERISA must be accommodated along with those of bankruptcy and labor law.

These bodies of law have been harmonized in several instances. Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, is meant to encourage collective bargaining. *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir.), *cert. denied*, 479 U.S. 949 [107 S.Ct. 433, 93 L.Ed.2d 383] (1986). Included as subjects of mandatory bargaining under § 1113 are retiree benefits and pension and insurance benefits for active employees. *See id.* at 274–75 (discussing *Allied Chem. & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 [92 S.Ct. 383, 30 L.Ed.2d 341] (1971). Thus, § 1113 of the Bankruptcy Code reflects labor law concerns. In 1986, we affirmed a district court decision that specifically stated "[t]he Bankruptcy Code and ERISA must be interpreted together." *In re Baptist Medical Center of New York, Inc.*, 52 B.R. 417, 419 (E.D.N.Y.1985), *aff'd.*, 781 F.2d 973 (2d Cir.1986) (per curiam). Hence, each of these areas of law is to be interpreted in light of the policies and goals of the other two.

In the instant case, a review of the administrative record fails to satisfy us that PBGC adequately considered the policies and goals of the bodies of law involved in this case and their interaction with each other. Rather, PBGC focused inordinately on ERISA. This failure renders PBGC's decision arbitrary and capricious.

Even when we examine the factors upon which PBGC did base its decision, we find no support in the administrative record for the conclusion reached. Thus, the restoration decision is insupportable as a matter of law.

In the Wheeling–Pittsburgh matter, there is no administrative record. The PBGC bases its restoration decision solely on its policy view that the adoption of the Follow–On Plans, while Wheeling–Pittsburgh was in Chapter 11 reorganization, constituted an abuse of the termination insurance program.

*PBGC v. LTV* continues at p. 1016–17: PBGC based its restoration decision partly on its finding that the adoption of the 1987 CBA Plans, while LTV was in Chapter 11 reorganization, constituted an abuse of the termination insurance program. We disagree.

Although ERISA section 4047 states that PBGC may restore terminated plans 'in any such case in which [PBGC] determines such action to be appropriate and consistent with its duties under this subchapter,' 29 U.S.C. § 1347, this does not lead to the conclusion that PBGC may base a restoration decision on the establishment of follow-ons. As indicated *infra*, the legislative history of section 4047 and the intentions of ERISA, bankruptcy and labor law belie such an assertion.

The legislative history of section 4047 reveals no indication that Congress intended the establishment of successive benefit plans to be a ground for restoration. Congress' focus in enacting section 4047 was mandating restoration if there was an improvement in financial circumstances. '[A] terminated plan being operated by a trustee as a wasting trust may be restored if, during the period of its operation by the trustee, experience gains or increased funding make it sufficiently solvent.' H.R.Conf.Rep. No. 1280, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5158. Similarly, the legislative history of SEPPAA bears no indication that Congress considered the establishment of follow-on plans subsequent to an involuntary termination to be a ground for restoration. *See* H.R.Rep. No. 241, 99th Cong., 2nd Sess., pt. 2, at 51–55, *reprinted in* 1986 U.S.Code Cong. & Admin. News 685, 709–13. The legislative history surrounding the most recent enactment of amendments to ERISA, the Pension Protection Act of 1987, Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, §§ 9301–9346, 101 Stat. 1330, 1330–331— 1330–374 (PPA), indicates that Congress considered and rejected the idea of prohibiting the establishment of follow-on plans and making the establishment of such plans a basis for a restoration decision. *See* H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 879–85, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1245, 2313–1625—2313–1631. Although this amendment governs only terminations occurring after December 17, 1987 and thus is not applicable to the instant case, it reflects the continuing consensus not to include the establishment of follow-ons as a basis for a restoration decision.

Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, encourages collective bargaining for debtors in reorganization. That LTV was in reorganization was no reason for pension plans not to be the subject of bargaining. *See Century Brass*, 795 F.2d at 274. *LTV*, in entering

collective bargaining with the Union, sought to ensure industrial tranquility by averting a strike. The Union was bargaining to ensure that its members received benefits commensurate with what had been promised them. Construing the policies of labor law and bankruptcy law in concert with ERISA's goal of the continued payment of pension benefits, we agree with the district court that the establishment of the 1987 CBA plans [i.e., the follow-ons] was acceptable.

Similarly, in the Wheeling–Pittsburgh case, the establishment of the Follow–On plans is acceptable. We have before us in the record all the factors upon which PBGC reached its administrative conclusion and find no support for its restoration decision. The determination made by PBGC was, as in *PBGC v. LTV*, arbitrary and capricious.

### 4. Voluntary or Involuntary Termination

■ The PBGC opinion letters submitted in *LTV* were voluntary terminations, as is the fact here. *LTV* was, however, an involuntary termination. PBGC now points out that the District and Circuit Courts in *LTV* noted involuntary termination there as a distinguishing feature.

The parties here have engaged in circular arguments as to whether termination of the plans was voluntary, under 29 U.S.C. § 1341, or involuntary, under 29 U.S.C. § 1342, and which section is applicable.

The Union and Wheeling–Pittsburgh argued that 29 U.S.C. § 1347 (ERISA § 4047), which confers such power of restoration as PBGC may possess, referred (as it existed in 1985) *only* to "plans terminated under § 1342" and that PBGC has no restoration power here since these plans were voluntarily terminated under § 1341.

The PBGC brief points out in response that upon a voluntary termination under § 1341, the termination is handled exclusively under § 1341 *only* if the plan assets are sufficient to pay all basic benefits; that if the plan assets are insufficient, § 1341(c) directs that PBGC "commence proceedings in accordance with the provisions of [§ 1342];" hence, PBGC argues, § 1342 on

involuntary terminations is applicable to a § 1341 voluntary termination, which therefore gives PBGC power to restore voluntarily terminated plans.

The PBGC brief also points out that the Termination Agreements specifically provide that the plans are terminated and the PBGC is appointed Trustee "pursuant to § 1342(c)."

The PBGC brief concludes: "Thus, ... the plans were terminated and PBGC was appointed trustee pursuant to section 4042 [29 U.S.C. § 1342]" (i.e., involuntarily).

In its Opposition, filed June 20, 1989, to the motion for temporary injunction, PBGC now states (commenting on the District Court and Circuit Court opinions in *PBGC v. LTV*):

> Although as a matter of policy, PBGC recognizes no distinction between voluntary and involuntary terminations in assessing whether proposed Follow-On plans constitute an abuse of the pension system, both courts thought to distinguish the case before them ... from the situation present in this case ..."

We think the difference is a matter of drama rather than substance—it is a dramatic spectacle of oppression to see PBGC force termination and then seek to prevent the affected parties from using post-termination wages to alleviate retiree hardships caused by PBGC's action.

In the instant case, there is no such drama. Or, if there is, it is in reverse. That is, we see a voluntary termination followed by Union–Employer efforts to supplement the PBGC guaranteed benefits, so as to give retirees nearly what the original plans had promised.

As to pre-termination planning, we believe that, well before the plan terminations in both *LTV* and Wheeling–Pittsburgh, all of the principle parties—the company officials, the Union officials and PBGC officials—knew the extent of the underfunding and the economic plight of the employer, and knew that pension plan termination was probable, if not imminent. It is beyond the realm of possibility that all of those officials did not contemplate future action following termination. Whether the plans terminated voluntarily or involuntarily, and whether the parties contemplated post-termination actions, are not relevant to a decision to restore the plans. In this, we concur with PBGC in that "no distinction between voluntary and involuntary termination" should be recognized in assessing restoration issues.

### 5. *PBGC's Concern*

PBGC is offended at the concept of using its own funds to pay insurance benefits to members of the employee body, while that same body of employees agrees (or conspires) with the employer to use current earnings to supplement those benefits, where the total benefits approximate the benefits under pension plans which are, or ought to be, terminated.

If Wheeling–Pittsburgh were out of business, PBGC would not be offended by PBGC's payment of guaranteed benefits. It also would not object if those retired beneficiaries obtained other supplemental employment to alleviate the stress of reduced retirement income. It would also not object if retirees were assisted by family, friends or fellow workers.

Why, then, is PBGC offended by the Follow-Ons? Because, we believe, the plans involve the same active workers in the same union, working in substantially the same physical facility and for the same nominal employer; this superficially has the appearance, at least to PBGC, of an illicit scheme by the employer to dump a major liability on the insurer while continuing business as before.

PBGC views the Union as consisting of the same body of employees as before the filing of the Chapter 11 reorganization proceeding. In this, it is correct. And the body of employees works in much of the same physical steel-making facility.

But PBGC also views Wheeling–Pittsburgh as the same employer as before bankruptcy. In this, it is in error. Wheeling–Pittsburgh is no longer as it was. Major production facilities have been sold off at enormous losses in order to curtail further losses. Coming out of this reorganiza-

tion process, the equity ownership will be substantially different. The new equity owners will be primarily the pre-bankruptcy creditors, or new investors of cash; the prepetition equity ownership will likely be reduced to a minor fraction of its prior interest, if it is accorded any interest at all. Wheeling–Pittsburgh is and will be a different employer coming out of Chapter 11, even though it will bear the name, "Wheeling–Pittsburgh Steel Corporation."

Viewed in this light, PBGC should not be offended that its purse will suffer. Its purpose is to assure payment of pension benefits in insolvency situations. This is an insolvency situation. Payment by it of the guaranteed benefits will fulfill the objectives of ERISA. All other parties in interest here have suffered losses—the trade creditors, the lenders, the active employees and retired employees, excepting only certain oversecured and priority creditors. PBGC is not alone. In the face of such general economic dislocation, PBGC should not assert that the statutory system for insuring pension rights is being abused.

PBGC asserts its Published Opinion Letter # 81–11 (May 11, 1981) relating to a company which "had little, if any, net worth." But that statement of policy and position contemplates a *solvent* company— one where the equity ownership remains intact, where creditors are unimpaired and employees are unaffected. PBGC's attempt to apply that letter here reveals a gross misunderstanding of the financial realities facing the parties having claims against and interests in Wheeling–Pittsburgh as a Chapter 11 debtor. The logic of that opinion letter is inapplicable to the case before us.

■ The plight of PBGC may be may be compared to that of other insurers in a bankruptcy context. Where an insurer has contracted for coverage prepetition, and the events insured against require postpetition payment for a prepetition injury (such as ongoing liability under workers compensation or other laws), then the insurer must pay even though the insurance premium was paid by extension of credit. The insurer has only a general unsecured claim against the debtor's estate for the amount of the unpaid premium. In the case of bankrupt companies under ERISA, Congress wrote with some precision how the PBGC claim should be handled, giving it certain priorities, and indicating that Congress considered the precise problem before us. 29 U.S.C. § 1362(c)(2) and § 1368(c)(2). Thus, PBGC is somewhat like other insurers with insurance obligations (although it suffers the disadvantage that it cannot fix its own premiums, while its exposure to substantial liability is controlled by the uncertainties of the economy and the marketplace, which in recent years have resulted in unprecedented, and perhaps frightening, claims). While the PBGC effort to protect its purse may be appreciated, its present posture in attempting to block the Follow–On Plans is inappropriate and not justified by ERISA. ERISA was intended to protect the retiree. PBGC's position here is antagonistic to that purpose.

### 6. PBGC Arguments

■ The PBGC contends that the Motion for Summary Judgment is not ripe for judicial review. It argues that the case involves disputed issues of material fact: 1) whether the Follow–On Plans constitute a continuation, *de facto* or *de jure*, of the terminated defined benefit pension plans; 2) whether the Follow–On Plans promise a particular benefit, or not particular benefit, to participants; and 3) whether there are other "fundamental differences" between the Follow–On Plans and the prior defined benefit plans.

It argues that in the affidavit of the Manager of its Actuarial Policy Division, he "finds a continuation." We view the finding of a "continuation" to be matter of a legal conclusion to be derived from the underlying or basic facts as to which there is no dispute.

The Follow–On Plans are defined contribution plans. If and when the fund created by the $1.05 per hour is exhausted, neither the active employees nor Wheeling–Pittsburgh have any further liability. PBGC argues that the Follow–Ons were

designed to approximate the amounts necessary, when added to guaranteed benefits to be paid by PBGC, "to provide benefits comparable in value 'to what people will be losing because of the termination of the pension plans';" that "the $1.05 figure was arrived at after careful study ... in order to achieve precisely this result;" and that the Union so advised its members.

We also read the Follow–Ons to provide the benefits described above. They are devised to make up 95% of what was lost upon termination of the plans.

There is a paramount difference, however. That is that the Follow–Ons are defined contribution plans and are not covered by ERISA, § 4021, 29 U.S.C. § 1321, nor guaranteed by PBGC. As to this, there is no dispute.

PBGC also argues that the issue of priority and the role of the Follow–On Plans in a plan of reorganization ought to be resolved first, that the Follow–Ons ultimately agreed upon as part of a reorganization plan may be "wholly different" from the ones before us (Exhibit K and Exhibit L to the Massco Declaration) and that, if so, PBGC might not then object, or the issue might be different. But Exhibits K and L have been agreed upon and signed by the Union and Wheeling–Pittsburgh, with the consent of the Creditors' Committee and the informal committee of bank creditors; they require no further negotiation; revision thereof is a possibility too remote to contemplate.

And if the Follow–Ons are amended hereafter to the prejudice of PBGC, the instant decision would not be binding as to that new situation. The state of the record and the reorganization proceeding as a whole demand that this issue be decided now.

PBGC reads the VEBAs and the Follow–Ons to require Wheeling–Pittsburgh to pay the benefit projections, whether or not the $1.05 per hour is sufficient to fund the program. This is an important point, because, if so, the VEBAs and Follow–Ons are defined benefit plans, subject to ERISA and PBGC guarantee obligations. We are not, however, in accord with PBGC's interpretation. Once the $1.05 per hour is con-

tributed, Wheeling–Pittsburgh has no further obligation; also, PBGC has no guarantee obligation; the subject plans are defined contribution plans.

PBGC argues that if the expected benefit levels are not reached, the debtor and the Union will increase the $1.05 per hour; and therefore, the plans become defined benefit plans. We think not. If further funding is needed or desired, such funding will be subject to the give and take of negotiations related to the wage structure. An adjustment of the hourly contribution might or might not be achieved. Even so, the policies of ERISA are not frustrated by such negotiation.

The PBGC argues "unjust enrichment," that approval of the Follow–On Plans will allow distributions from Wheeling–Pittsburgh's bankrupt estate to retirees in excess of such allowances under § 507 of the Bankruptcy Code. PBGC's argument is premised on the assumption that the funding of the Pensioners' Relief Program, the $1.05 per hour, is a contribution by Wheeling–Pittsburgh. If the $1.05 per hour is a postpetition payment by Wheeling–Pittsburgh of benefits earned prepetition, then PBGC is correct—the distributions to retirees violates the Bankruptcy Code and are improper. This, in fact, is the knee-jerk reaction of the bankruptcy judge, practiced as he is to be alert to such conduct. But here, the Union and the employer tell us that the $1.05 was collectively bargained, that the employees conceded the $1.05 out of their wage package, that the $1.05 is therefore a current contribution by active employees, who choose to donate it to the Relief Program. If so, other creditors cannot complain.

The answer is in the words of the court in *PBGC v. LTV* at p. 1016, that "here, the policies and goals of ERISA must be accommodated along with those of bankruptcy and labor laws." We think that as a practical application of such accommodation, we must accept the collectively bargained agreement which tells us that the $1.05 is a contribution by the active employees as a deduction from wages which otherwise would go into their pockets.

We also think it certain that if the $1.05 per hour is not paid into the Pension Relief Program, it will not be retained by Wheeling–Pittsburgh. There is therefore no substance to the argument on unjust enrichment.

PBGC also argues that Wheeling–Pittsburgh is attempting to "continue its ongoing retirement program largely at PBGC's expense;" that a solvent company is deterred from such pension plan termination because of the resultant liability to PBGC, but there is no such deterrence for an insolvent company (such as Wheeling–Pittsburgh), which may "have little to lose and much to gain by filing for bankruptcy and terminating its pension plans;" that by agreeing to follow-on programs, it "would continue its ongoing retirement program largely at PBGC expense;" and that "If Wheeling–Pittsburgh were successful in 'gaming' PBGC in this fashion, any incidental financial detriment (due) to its bankruptcy filing would certainly have been fully justified;" that if Wheeling–Pittsburgh and the Union are successful here, PBGC will face "broader, programmatic damage" in that other firms "will be attracted by the [same] temptation" implying a wholesale resort to bankruptcy by employers for the purpose of obtaining funds from PBGC.

We think the PBGC argument reveals a fundamental failure to understand its own mission. It was created to collect premiums and other funds, and pay out pension benefits *in the event of insolvency. Insolvency* is the thing from which PBGC is to protect pensioners. Insolvency protection is PBGC's mission. Yet, PBGC views solvent companies as being no different from insolvent companies.

It stretches credulity to believe that the officials of PBGC do not understand the difference, or the devastating impact upon the former ownership of the resort to Chapter 11 of the Bankruptcy Code in this case.

When PBGC speaks of an "incidental financial detriment" due to a bankruptcy filing, it reveals a lack of appreciation for the agonizing readjustments which are nec-

essary in the instant reorganization proceeding.

### 7. Re–Termination

■ Wheeling–Pittsburgh agreed in the Termination Agreements that it would not implement the Follow–Ons without PBGC approval or a court order of approval. Absent such agreement, Wheeling–Pittsburgh could implement the plans and await PBGC's order of restoration. If such restoration were allowed, then upon such restoration, the debtor would still be unable to make the payments or, creditors might insist that Wheeling–Pittsburgh be liquidated under Chapter 7; then, the plans would necessarily be re-terminated. As to this possibility, the court in *PBGC v. LTV* said at p. 1020:

> We note that nowhere in the administrative record is there any evidence that PBGC assessed the possibility that the Plans would have to be re-terminated. ERISA contains no special provisions governing re-termination; however, the standards would be the same for an initial termination. If in the near future LTV were once again found unable to adequately fund the Plans, the resulting vacillation in agency policy would lead to uncertainties on the part of the retirees, plan sponsors, creditors and the government. Such uncertainty is to be avoided where possible. *See New York Council, Ass'n. of Civilian Technicians*, 757 F.2d at 508.

The same reasoning applies here.

### D. THE MOTION FOR PRELIMINARY INJUNCTION

■ Since the execution of the Termination Agreements on August 19, 1986, the Union and the debtor have caused to be disbursed from the PENSIONERS' RELIEF FUND (made up of the contributions of $1.05 per hour actually worked) benefits to pensioners and other beneficiaries under the VEBA programs. In the Termination Agreements, Wheeling–Pittsburgh agreed not to pay out VEBA benefits after August 19, 1988. PBGC granted prior extensions to that agreement, but declines further extension beyond June 19, 1989. Wheeling–

Pittsburgh and the Union desire to continue making payments under the VEBAs until the legal status of the Follow–On Plans is determined.

The Union and Wheeling–Pittsburgh therefore filed a MOTION FOR PRELIMINARY INJUNCTION seeking an order of court allowing debtor to continue to make payments of the VEBA benefits from funds set aside in the collectively bargained Pensioners' Relief Fund and forbidding PBGC, on account of such payments, from taking any actions to restore or otherwise void the termination of debtor's defined benefit pension plans, from invoking the liquidating damages or other remedial clauses of the Termination Agreements, or from interfering in any manner with the continuation of the VEBA program.

Preliminary injunctive relief may be granted if the court finds that:

1. plaintiffs are likely to succeed on the merits;

2. irreparable injury will result to plaintiffs if the preliminary injunction is not issued;

3. the hardship imposed on plaintiffs if the preliminary injunction is denied outweighs the harm to the defendant if the preliminary injunction is granted; and

4. the public interest favors issuance of the preliminary injunction.

*Connors v. Shannopin Mining Co.*, 675 F.Supp. 986, 987 (W.D.Pa.1987) (citing *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 181 [3d Cir.], *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 [1987] and *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 [3d Cir.1987] ).

The standards for a preliminary injunction are clearly met in this case and the preliminary injunction should be granted, but for the fact that plaintiffs are attempting to have the court rewrite a specific agreement between the parties, which we think the court cannot do. The agreement between Wheeling–Pittsburgh and PBGC plainly required a termination of the VEBA program by a certain date. That date has been extended by agreement. PBGC refuses further modification of the agreement. The court has no authority to change the agreement. *Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571 (2d Cir.1976).

■ Another solution was suggested at argument. The VEBA program is substantially identical to the Follow–On program. The matter before us is whether the existence of the Follow–On plan is a sufficient reason for PBGC to restore the terminated plans. In the foregoing pages, we have determined that the existence of the Follow–On plans, in their present form, is not a basis upon which PBGC can restore the terminated plans. Therefore, the relief which the Union and Wheeling–Pittsburgh request can be granted by an immediate order granting the Motion for Summary Judgment temporarily, pending a final order by the District Court.

As to the Follow–On plans, plaintiffs are likely to succeed on the merits.

Irreparable harm is shown when a curtailment of benefits to retirees and workers is threatened. *Connors v. Shannopin Mining Co.*, 675 F.Supp. 986 (W.D.Pa.1987) and *Combs v. Hawk Contracting, Inc.*, 543 F.Supp. 825, 829–30 (W.D.Pa.1982). In the present circumstances, if the payments to retirees and other beneficiaries are not continued, either under the VEBAs or the Follow–On plans, retirees will lose retirement income, which in many cases represents their primary source of income. Further, the loss of retirement income and of the earned right to immediate retirement for certain active employees, would substantially disrupt employee relations at Wheeling–Pittsburgh. Reorganization efforts of the debtor would be severely impaired. Legal remedies are inadequate to remedy such harm. Therefore, the irreparable harm is established in order to justify preliminary relief, even if temporary, pending the ultimate resolution of plaintiff's action for declaratory judgment.

We further examine the possibility of harm to other interested parties from the grant of an immediate preliminary order and the public interest. The PBGC has agreed to prior extensions of the scheduled expirations of the VEBAs. Any harm from

a temporary extension of relief as to the Follow–On plans, until a final ruling on the pending Summary Judgment Motion does not outweigh the irreparable harm that will occur if the benefit payments are discontinued.

The public interest is served by continuance of the retirees' pension benefits and by retaining active employees' rights to elect retirement.

## II. APPROVAL OF SETTLEMENT WITH PBGC

■ Following Wheeling–Pittsburgh's filing for protection under Chapter 11 of the Bankruptcy Code, the debtor rejected its various pension plans as executory contracts and terminated the plans.

By reason of the foregoing actions, the PBGC filed numerous substantial claims, to which the debtors filed objections. As a result of extended negotiations and numerous hearings, Wheeling–Pittsburgh and PBGC have reached a settlement agreement and now request approval of the agreement by this court.

M & I Marshall & Ilsley Bank and Marshall & Ilsley Trust Company (collectively, the "M & I Bank") have filed an objection to the proposed settlement claiming that the settlement is not in the best interests of the estate and it is not fair and equitable. The M & I Bank further requests permission to conduct discovery concerning the settlement.

The issues presented for resolution by this court are:

1. Is the settlement agreement in the best interest of the estate?

2. Is the settlement fair and equitable?

3. Should the M & I Bank, a third party, be allowed to conduct discovery on the fairness of the proposed settlement?

Counsel for the debtor argues that the settlement agreement resolves all of the PBGC's claims, while the M & I Bank argues that the agreement is not a complete settlement and, thus, is not in the best interests of the estate.

The basis for the M & I Bank's argument is a trust agreement entered into on September 15, 1982 between the M & I Bank and the debtor. The trust provisions provide that the debtor will indemnify the M & I Bank for any claims arising out of their relationship.

Current litigation is pending, brought by PBGC against the M & I Bank in which the PBGC alleges that the M & I Bank breached certain of its fiduciary duties with respect to the debtor's pension plans. Since the proposed settlement agreement releases all of PBGC's claims against the debtor, while reserving PBGC's rights to assert such claims against any other party, the M & I Bank believes it not to be a full settlement. The M & I Bank asserts that the debtor's indemnity obligation to M & I is a postpetition claim, thereby increasing the potential impact upon the debtor's estate to the detriment of the debtor and creditors.

A sufficient factual record must exist before a settlement may be approved. *See e.g., Protective Committee for Independent Stockholders, etc. v. Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968), *reh. den.,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968); *In re A & C Properties,* 784 F.2d 1377, 1381 (9th Cir.1986); *Matter of AWECO, Inc.,* 725 F.2d 293, 299–300 (5th Cir.1984) *cert. den.* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

This court has examined the proposed settlement and the factual record of this case. PBGC has filed priority and other claims against the debtor in excess of $500 million. The compromise agreement enables the debtor to settle these claims for $85 million. The payment also eliminates the debtor's pension plan funding deficiency, preventing imposition of substantial assessments of excise tax by the IRS.

Further, there has been no determination that PBGC's claim against the M & I Bank is valid. Even if this claim is found to be valid and indemnification is sought from the debtor, this court believes the claim would be an unsecured prepetition claim.

The proposed settlement has great value to the debtor in reducing and fixing the potential claims of PBGC which have been

surrendered or modified. Based on the factual record, this court finds the settlement agreement to be in the best interests of the estate. The Official Committee of Unsecured Creditors and other parties in interest concur.

The M & I Bank asserts that the proposed settlement should be rejected for the additional reason that it constitutes a fraud on equity. After examining the settlement agreement, we determine that it comports with the principle of fairness and equity in light of all the circumstances. The debtor and PBGC have reached a reasonable agreement which benefits the debtor, the estate and the creditors, and the rights of third parties are not impaired. It is not the debtor's obligation to settle a dispute between PBGC and the M & I Bank. The agreement does not prevent the Bank from filing a proof of claim against the estate for any losses it suffers, based on the indemnity agreement. Nor does it foreclose any defenses which debtor may have to such claim.

The M & I Bank seeks discovery concerning the impact of the settlement agreement on the Bank. Any impact the settlement has on the M & I Bank is relevant only to the PBGC suit against the M & I Bank and will be discoverable in that litigation.

This court, therefore, will recommend that the settlement agreement between the debtor and PBGC be approved.

## III. OBJECTION TO IRS PROOFS OF CLAIM NUMBERS 12682, 12683, 12684, 12686, 12687, 12688, 12689

### A. PRELIMINARY STATEMENT

The United States of America, Internal Revenue Service ("IRS"), has filed proofs of claim totaling $454.9 million[5] based on § 4971 of the Internal Revenue Code ("IRC"). The IRS further asserts that its claims are entitled to priority status under § 507(a)(1) and (a)(7) of the Bankruptcy Code.

Wheeling–Pittsburgh denies any liability under IRC § 4971 and opposes priority status for the IRS's claims.

The parties have agreed, by stipulation, to all the relevant facts in this case and have submitted this matter for disposition by summary judgment pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56. For reasons set forth below, we conclude that Wheeling–Pittsburgh has no liability under IRC § 4971 and, accordingly, we will grant Wheeling–Pittsburgh's motion for summary judgment.

### B. CASE SUMMARY

The debtor experienced financial difficulties and was unable to fund its pension plans beginning in 1982. As a result, Wheeling–Pittsburgh applied to the IRS for waivers of the minimum funding standards for several of its pension plans, pursuant to IRC § 412(d). Waivers were granted by the IRS for plan year 1982 totaling $49.8 million and for plan year 1983 totaling $23.6 million. In 1985, Wheeling–Pittsburgh sought a $28.3 million waiver for plan year 1984.

On April 16, 1985, before the IRS acted on Wheeling–Pittsburgh's waiver application for 1984, the debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

Subsequently, on October 29, 1985, Wheeling–Pittsburgh rejected its pension plans as executory contracts pursuant to § 365 of the Bankruptcy Code, and terminated those plans effective November 8, 1985. The minimum funding requirements of the IRC would have required contributions of $30.5 million for Wheeling–Pittsburgh's 1985 plan year.

By letter of July 21, 1986, the IRS denied Wheeling–Pittsburgh's 1984 waiver application and stated that the waivers previously granted for 1982 and 1983 were retroactively null and void.

On August 25, 1986, the IRS filed proofs of claim totaling $454.9 million that it

---

**5.** The debtor's records indicate that the objectionable proofs of claim total $454,102,172.21.

The difference is immaterial to the court's decision in this case.

claimed were due under IRS § 4971(a) and 4971(b).

Wheeling–Pittsburgh's objections asserting that the IRS's claims are not allowable under applicable law and, even if allowed, the IRS's claims are penalties that should be equitably subordinated to the claims of other creditors, or, in the alternative, denied priority status.

The IRS mailed notices of deficiency to Wheeling–Pittsburgh on March 11, 1987 setting forth the amounts claimed due under IRC § 4971(a) and 4971(b).

On December 1, 1988, this court heard oral argument on behalf of the IRS and Wheeling–Pittsburgh concerning the IRS's $454.9 million claim.

A supplemental brief was filed on December 30, 1988 by the IRS reducing its claim to $107 million from the original claim of $454.9 million, based on the debtor's settlement with PBGC.

## C. ISSUES PRESENTED

(1) Does the IRS have an allowable claim for excise taxes imposed under 26 U.S.C. § 4971(a) and (b) as a result of its post-bankruptcy revocations of pre-bankruptcy waivers.

(2) Are the IRS claims allowable as post-petition administrative claims when imposed under 26 U.S.C. § 4971(a) and (b) for a debtor's failure to make plan contributions for tax periods occurring prior to filing of Chapter 11 when the tax returns and payments are due postpetition.

(3) Does settlement with the PBGC of any accumulated funding deficiency for less than 100% of the amount due constitute a correction for purposes of 26 U.S.C. § 4971(c)(2).

## D. THE MERITS

### 1. Revocation of Waivers

■ IRC § 4971 sets forth the types of claims which are imposed to discourage the underfunding of pension plans as follows: (a) Initial Tax. For each taxable year of an employer who maintains a plan to which Section 412 applies, there is hereby imposed a tax of 5% on the amount of the accumulated funding deficiency under the plan, determined as of the end of the plan year ending with or within such taxable year. The tax imposed by this subsection shall be paid by the employer responsible for contributing to or under the plan the amount described in § 412(b)(3)(A).

(b) Additional Tax. In any case in which an initial tax is imposed by subsection (a) on an accumulated funding deficiency and such accumulated funding deficiency is not corrected within the taxable period, there is hereby imposed a tax equal to 100% of such accumulated funding deficiency to the extent not corrected. The tax imposed by this subsection shall be paid by the employer described in subsection (a).

While § 4971 imposes an assessment on an employer who has an accumulated funding deficiency under a pension plan, the IRS has statutory authority to waive an employer's minimum required contribution for a plan. IRC § 412(d); ERISA § 303(a), 29 U.S.C. § 1083(a); Rev.Proc. 83–41, 1983–1 C.B. 775.

The debtor in this case applied to the IRS and was granted such funding waivers for the debtor's 1982 and 1983 plan years. After Wheeling–Pittsburgh filed its petition for reorganization, the IRS notified the debtor that the funding waivers for 1982 and 1983 were retroactively void. IRS has imposed § 4971 liability on deficiencies resulting from revocation of its waivers.

Counsel for the debtor argues that such imposition is inconsistent with the general purposes and policies of the waiver provision, and is inequitable under the Bankruptcy Code. The IRS contends that the waivers for 1982 and 1983 were conditioned upon timely payment of future contributions and Wheeling–Pittsburgh's failure to timely remit contributions for plan year 1984 rendered the previous waivers void.

To support its argument, the debtor points to the automatic stay provision of Bankruptcy Code § 362 and case law reflecting the bankruptcy policy that creditors should not be allowed to take post-

bankruptcy actions to improve their position in relation to other creditors. Such actions violate the bankruptcy principle of equality among creditor claims. *See, e.g., Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941).

The debtor further points to legislative history which specifically states that sanctions under § 4971 will be imposed "only if a waiver has not been obtained." H.R.Rep. No. 807, 93d Cong., 2d Sess. 97, *reprinted in* 1974 U.S. Cong. & Admin. News 4639, 4670, 4763, *and in* 2 ERISA Legislative History 3115, 3217 (1976).

When Wheeling–Pittsburgh filed its bankruptcy petition on April 16, 1985, the IRS had no claim under § 4971. Waivers had been obtained for the contributions due for 1982 and 1983. Even if IRS were allowed to revoke the waivers, the debt occurred prepetition and could only be paid pursuant to a plan of reorganization. To allow IRS to impose assessments on the debtor for failure to remit contributions when the debtor is prohibited by the Bankruptcy Code from making payment is inherently unfair. This court finds revocation of the waivers for the 1982 and 1983 plan years to be inconsistent with Congressional intent and inequitable under the Bankruptcy Code. Excise tax assessments imposed by the IRS as a result of revocations of the pre-bankruptcy waivers are not valid.

### 2. Assessments—1984 and 1985

The debtor claims it refrained from making contributions for plan years 1984 and 1985 because it could not legally make payment of obligations arising prepetition under the Bankruptcy Code. The IRS asserts that the filing date of a tax return is determinative of the prepetition claim or postpetition administrative expense status of a tax return. IRS Forms 5330 for reporting tax liability on the debtor's plans for 1984 and 1985 became due after the April 16, 1985 petition date. The IRS asserts that since the returns were due after the filing date, its claim for excise taxes is an administrative expense.

It is a well-settled rule that the time period when the tax obligation accrues is the crucial factor, rather than the date a tax return is due. *In re Unimet Corp.*, No. 685–00240 (Bankr.N.D.Ohio Nov. 17, 1986); *In re Overly–Hautz Co.*, 57 B.R. 932 (Bankr.N.D.Ohio 1986), *aff'd.* 81 B.R. 434 (N.D. Ohio 1987); and *In re Scrap Disposal, Inc.*, 24 B.R. 178 (Bankr.S.D.Cal. 1982), *aff'd.* 38 B.R. 765 (Bankr.App. Panel 9th Cir.1984). This court concurs with the view that since the transaction or events upon which these taxes are based occurred prepetition, administrative expense status is denied. The basis for the excise tax claim was the failure to pay prepetition pension plan contributions; the contributions could only be paid pursuant to a confirmed plan of reorganization. Bankr. Rule 3021; *Official Committee of Equity Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987) *cert. denied,* —— U.S. ——, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988). Accordingly, any failure to make such contributions is protected under bankruptcy law and cannot be penalized by the IRS.

The IRS asserts that its claim under IRC § 4971 is a "tax" and not a penalty. The mere label of an exaction as a tax will not govern its characterization for purposes of bankruptcy law. *See New York v. Feiring*, 313 U.S. 283, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941); *In re Unified Control Systems, Inc.*, 586 F.2d 1036 (5th Cir.1978); *In re Kline*, 403 F.Supp. 974 (D.Md.1975) *aff'd per curiam*, 547 F.2d 823 (4th Cir.1977); *In re Mansfield Tire & Rubber Co.*, 80 B.R. 395 (Bankr.N.D.Ohio 1987), *appeal docketed*, No. C87–2641A (N.D. Ohio Sept. 10, 1987). The IRS cites *Latterman v. United States*, 691 F.Supp. 893 (W.D.Pa.1988), *appeal docketed*, No. 88–3448 (3d Cir. July 6, 1988) for the proposition that excise tax claims under IRC § 4971 are "taxes." The *Latterman* court carefully distinguished bankruptcy cases in which IRC § 4975 excise taxes were treated as penalties under bankruptcy law. The *Latterman* court observed that the bankruptcy decisions:

interpreted § 57j of the Bankruptcy Act and decided the cases in conformance *with the express congressional bankruptcy policy to prevent the United*

*States from securing preferences over other creditors when the government's interest in the revenue was insufficiently related to income generation. There is no conflicting congressional policy in the present case. Nor must we consider any other related statutes or congressional policies. We are concerned here only with the specific language of § 4975(a).* (Emphasis added.)

*Latterman,* 691 F.Supp. at 897.

The penal purpose of IRC § 4971 is apparent from the Senate Report that accompanied the enactment of ERISA:

The bill also provides new and more effective *penalties* where employers fail to meet the funding standards. In the past, an attempt has been made to enforce the relatively weak funding standards existing under present law by providing for immediate vesting of the employees' rights, to the extent funded, under plans which do not meet these standards. This procedure, however, has proved to be defective since it does not directly *penalize* those responsible for the underfunding. For this reason, the committee bill places the obligation for funding and the *penalty* for underfunding on the person on whom it belongs—namely, the employer.

S.Rep. No. 383, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S.Code Cong. & Ad. News,* 4890, 4909 (emphasis added). The House Ways and Means Committee Report is virtually identical. *See* H.R.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S.Code Cong. & Ad. News,* 4670, 4763–64.

The Senate Finance Committee went on to emphasize Congress's intent to affect the behavior of employers who are otherwise financially able to meet their pension funding obligations:

... The committee believes that current *sanctions* on an employer for failure to adequately fund his qualified plan are inappropriate since they may not affect an employer's decision to underfund his plan. For example, an employer may not feel any reason to make the minimum required contributions to his plan if the only consequence of underfunding is to give his employees vested rights in the amounts that are already funded. To resolve this problem, the committee's bill provides an excise tax on the failure to meet the minimum funding requirements.

S.Rep. No. 383, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S.Code Cong. & Ad. News,* 4890, 4941 (emphasis added).

This court finds that the IRS's claims under § 4971 are penalty claims for bankruptcy purposes. Since Wheeling–Pittsburgh was forbidden from paying prepetition plan contributions postpetition under bankruptcy law, equitable considerations dictate that the IRS's claims be disallowed. It is inherently unfair to punish the debtor's creditors by allowing these penalties for the 1984 and 1985 plan years where the debtor was completely in compliance with the contribution requirements imposed upon it at the time it filed the Chapter 11 petition.

### 3. Correction

IRC § 4971(b) directs that the IRS may not assess the 100% excise tax if the accumulated funding deficiency is corrected within the taxable period. Taxable period is defined under IRC § 4971(c) as a period ending on the date of mailing of a notice of deficiency or the date of assessment.

§§ 4971 and 4973 of the IRC provide a longer correction period before a 100% assessment under § 4971(b). That correction period extends 90 days beyond the date of mailing of a notice of deficiency, and can be further extended (1) for any period in which a deficiency cannot be assessed under IRC § 6213(a), and (2) for any other period determined by the IRS to be reasonable and necessary. 26 U.S.C. § 4963(e)(1).

§ 6213(a) provides a period after the mailing of a notice of deficiency during which a taxpayer may file a petition with the United States Tax Court for redetermination of the deficiency, thereby forestalling any imposition of a 100% assessment. 26 U.S.C. § 6213(a). § 6213(f)(1) further allows that this appeal period is suspended "for the period during which the debtor [in

any bankruptcy case] is prevented from filing a petition in the Tax Court with respect to such deficiency, and for 60 days thereafter." 26 U.S.C. § 6213(f)(1).

Counsel for the debtor argues that the debtor has not exhausted the time for correcting any deficiencies with respect to the pension plans. The IRS, after oral arguments, in its supplemental brief, has agreed that the debtor is still within the correction period.

It is clear to this court that the debtor is within the correction period since the notices of deficiency were issued by the IRS during the pendency of this bankruptcy proceeding. Because this bankruptcy proceeding has not concluded, the correction period for Wheeling–Pittsburgh has been tolled and no 100% penalty under IRC § 4971(b) may be assessed.

▇▇▇ The question now focuses on whether Wheeling–Pittsburgh's settlement of its obligations under the pension plans with the PBGC is a full correction.

IRC § 4971(c)(2) defines correction as: ... the contribution, to or under the plan, of the amount necessary to reduce such accumulated funding deficiency as of the end of a plan year in which such deficiency arose to zero.

The debtor has negotiated a settlement of its minimum funding obligations to the pension plans with the PBGC which, it argues, reduces any deficiency to zero, within the correction period, preventing the IRS from imposing assessment under § 4971(b). The IRS asserts that settlement for less than the full amount cannot be a full correction of the accumulated funding deficiency and that such settlement reduces but does not eliminate the 100% assessment under IRC § 4971(b).

This court finds the imposition of a 100% penalty for failure to correct any deficiency is indefensible in this case because Wheeling–Pittsburgh has done everything it could to bring about a correction. Correction is accomplished by reducing the deficiency to zero. Wheeling–Pittsburgh has settled these contribution claims with the PBGC, which allows for payment of an agreed-upon amount in a plan of reorganization approved by this court to be taken as full payment and satisfaction of all such claims.

The Bankruptcy Code provides, with certain exceptions not applicable in this case, that confirmation of a plan operates to discharge "all claims and interests of creditors." 11 U.S.C. § 1141.

We conclude, therefore, that Wheeling–Pittsburgh's full satisfaction of plan contribution claims in the context of this bankruptcy proceeding had the effect of reducing the claims of these plans to zero, and thus constitutes a correction within the meaning of § 4971(c)(2) of the Internal Revenue Code.

Having corrected any deficiency upon which the IRS can base a claim under § 4971, within the correction period provided by statute, Wheeling–Pittsburgh cannot be held liable for the IRS's 100% claim.

Having found the IRS's claim of no merit, it is not necessary for this court to subordinate those claims to those of other unsecured creditors.

Wheeling–Pittsburgh's objections to claim numbers 12682–12689 of the IRS will be sustained and the claims dismissed.

## IV. CONCLUSIONS

There are no material facts in dispute and the matter should be decided on the basis of the record before us. The Motion for Preliminary Injunction (which relates to the VEBA benefits) should be denied, but the Motion for Summary Judgment should be granted temporarily, to allow immediate interim employee benefits to be paid under the Follow–On Plans pending a final order, and then a final order should be entered granting the Motion and entering judgment.

The stipulation of settlement between the debtor and PBGC as to PBGC's proofs of claim should be approved.

The debtor's objections to the excise tax claims of IRS should be sustained and the claims dismissed.